Steve Owen ANDERSON, Appellant,

v.

The STATE of Texas, State.

No. 2-87-146-CR.

Court of Appeals of Texas,
Fort Worth.

Sept. 1, 1988.

Alan K. Butcher, Zachry, Kearney, Hill, Beatty, & Butcher, Fort Worth, for appellant.

Tim Curry, Criminal Dist. Atty., David L. Richards and Timmie White, Asst. Criminal Dist. Attys., for the State.

Before BURDOCK, FARRIS and LATTIMORE, JJ.

## OPINION

LATTIMORE, Justice.

Appellant, Steve Owen Anderson, was convicted by a jury of the offense of murder. *See* TEX. PENAL CODE ANN. 19.02 (Vernon 1974). The jury assessed punishment at twenty-five years confinement in the Texas Department of Corrections.

Appellant brings four points of error alleging improper use of peremptory challenges and improper impeachment.

We reverse and remand.

By his first, second, and third points of error, appellant complains of three peremptory challenges made by the State of potential veniremen, all of whom were black, citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) in support of his contention. Both appellant and the deceased are/were black. Appellant struck the fourth black member of the panel who was a parole officer who stated he would be biased in favor of the State. The following are the statements made by the prosecutor as to why he struck the three potential jurors in question, and the reply of appellant's counsel:

MR. BALDWIN: Mr. Coleman was a parole officer, and said that he would be biased for the State. We have a reason for striking ours. But, the three others—we are left with an all white jury and a black Defendant.

THE COURT: All right. You need to state your reasons, then, Counsel, why you struck them, the black jurors.

MR. WHITE: I remember striking No. 9, Mr. Ellis, because, first of all, he slumped in his chair. He didn't wear a suit and tie to Court, and he seemed reserved when I asked him to answer my questions. And I thought that was indicative of a lifestyle that was opposite for the State. And, I felt like he would be biased for the Defendant.

There was another lady on here that was cut. I think her name was Verta Coleman [No. 11] (brackets in original). She was one that had apparently been accused of theft, in a theft case, and she stated that she was concerned, or she disliked the way the police handled that. And I felt like, given the fact that there were police officers in this case, that that may spill over in our case, since she was saying she was wrongfully accused. And, I think she also had a relative that had been accused of a crime.

THE COURT: All right. There was one other.

MR. WHITE: The other one was a lady that was in the corner that had apparently—I don't remember her name—Janice Hall Crosby [No. 20] (brackets in original).

The main reason that I struck her was the fact that she mentioned she had had surgery, and I was concerned as to whether or not, medically, she would have the stamina to sit through the entire trial.

Another thing that I was concerned about was her background. I think she went to some kind of trade school and got some kind of a diploma. But, she said she finished high school here in Fort Worth. And I felt like, because of her educational background, she might have some problem considering all the testimony.

I also noted, when I talked to her, that at times when I asked her to answer my questions, she seemed reserved and she spoke very soft. I had problems understanding what she was saying. And that's the other reason that I struck her.

MR. BALDWIN: May I respond to that, Your Honor?

THE COURT: Very briefly.

MR. BALDWIN: I believe that we had 42 jurors here, several of which were men.

In response to his statement on Arthur Ellis, I believe there were only two suits in the whole crowd, and I don't know if every person was in Court's clothes, attire. I believe there were only two or three suits on any of the men. He did not slump.

As far as Ms. Coleman is concerned, she had been accused of theft, but it was all cleared up, and the case was solved.

And her sister was a Fort Worth police officer, and she showed no signs of being a hostile juror to either side.

As far as Janice Crosby, she had had knee surgery. And the vocational education that he complains about that would make it difficult for her to understand the case is, she is a licensed vocational nurse. She was educated in Fort Worth and has a degree in nursing. It does not disqualify her in any manner and, in fact, shows—I believe that we have people who were selected on the jury with less education than she had.

I think the reason shows systematic exclusion of blacks from the jury without any reason at all. I mean, the fact that Mr. Ellis wasn't wearing a tie would disqualify all of the male jurors. I don't think there is a male juror on here that's wearing a tie right now. I don't think there is any male juror on the jury with a tie.

I think the grounds stated for exercising the peremptory challenges are inadequate.

THE COURT: All right. I'll deny your objection; overrule your objection,

Mr. Baldwin. I'll note your exception, and I'll seat the jury as chosen.

MR. WHITE: Before we go any further, I would like the record to reflect that one black juror wasn't struck by the State, the parole officer.

So, if he's saying systematic exclusion, I don't think it was a systematic exclusion.

THE COURT: All right. That was the parole officer, Mr. Smith, Isaac Earl Smith, Jr.?

MR. BALDWIN: He stated that he would be biased and prejudiced in favor of the State.

*Batson* set forth the standards for assessing a prima facie case of discriminatory selection of the venire. The defendant must show: 1) he is a member of a cognizable racial group; 2) the prosecutor had exercised peremptory challenges to remove from the venire members of the defendant's race; and 3) the facts and any other relevant circumstances which raise an inference that the prosecutor used peremptory challenges to exclude the veniremen on account of their race. The defendant's establishment of a prima facie case creates a rebuttable presumption that the prosecutor exercised his peremptory challenges in a discriminatory manner. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, n. 7, 101 S.Ct. 1089, 1094, n. 7, 67 L.Ed.2d 207 (1981), the burden of production then shifts to the State to come forward with a neutral explanation for the challenges. *Batson*, 106 S.Ct. at 1723–24, n. 20, *citing Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096.

The Texas Court of Criminal Appeals has addressed this issue in *Tompkins v. State*, No. 68,870, slip op. TC–87–30–111 (Tex. Crim.App. Oct. 7, 1987) (not yet reported). The Court stated that a prima facie case represents the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true. *Id.* at TC–87–30–117. The party with the burden of proof must produce at least this much evidence to avoid a finding that the allegation is not true as a matter of law. *Id.* Once produc-

ed, however, the allegation must be found true unless it is contradicted, impeached, or rebutted by other evidence. *Id.* In the present context, such other evidence must include a racially neutral explanation by the prosecuting attorneys, and must be legally adequate to support a judgment in favor of the State. *Id.* If it is, an issue of fact is joined which can only be resolved by an assessment of evidentiary weight and credibility. It is the burden of the accused to persuade the trial judge by a preponderance of the evidence that the allegations of purposeful discrimination are true in fact. *Id.* at TC–87–30–111.

In *Batson*, Justice Powell, writing for the Court, emphasized that the prosecutor's explanation need not rise to the level justifying the exercise of a challenge for cause, *Batson*, 106 S.Ct. at 1723–24, but the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race. *Id.* Since the trial judge's findings in the context of determining whether, after the prosecutor's explanation of his reasons for his strikes, the defendant has established purposeful discrimination will largely turn on evaluation of credibility, a reviewing court ordinarily should give these findings great deference. *Batson*, 106 S.Ct. at 1724, n. 21. Appellant alleges that the standard of review for *Batson* errors is that of "clearly erroneous." We disagree.

The most recent in-depth analysis of *Batson* error by the Texas Court of Criminal Appeals is *Keeton v. State*, 749 S.W.2d 861 (Tex.Crim.App.1988) (opinion following abatement). In *Keeton*, the Court referred to three cases from other jurisdictions with an express approval: *State v. Antwine*, 743 S.W.2d 51 (Mo.1987); *Slappy v. State*, 503 So.2d 350 (Fla.Dist.Ct.App.1987); *Ex Parte Branch*, 526 So.2d 609 (Ala.1987).

The Court first analyzed the role of the trial judge, approving the conceptual analysis of the above courts. *Keeton*, 749 S.W. 2d at 865. In *Antwine*, the Missouri Su-

preme Court stated that the trial judge's task is extremely difficult since it is doubtful that a prosecutor would admit to a challenge based on race. *Antwine,* 743 S.W.2d at 64. The trial court is left with determining whether the neutral explanation is just that or an excuse for improper discrimination. *Id.* The Missouri Court holds that *Batson* leaves room for the State to exercise peremptory challenges on legitimate "hunches" and past experience, so long as racial discrimination is not the motive. *Id.* at 65. The Court also noted that "neutral explanations" which are no more than facially legitimate are insufficient. *Id.* The trial judge's assessment is both objective and subjective. *Keeton,* 749 S.W.2d at 865, *citing Antwine,* 743 S.W.2d at 51–52.

In *Slappy,* a Florida Court of Appeals focused on the trial judge's responsibility with respect to the explanation given by the prosecutor in order to rebut the presumption of his use of racially motivated strikes. After an analysis of California law, the Florida court promulgated a list of actions by the State which will weigh heavily against legitimacy of any race-neutral explanation, such as: group bias where the trait is not shown to apply to the challenged juror; no perfunctory examination of the challenged juror; questions which evoke a certain response, not asked of other panel members; reason for challenge unrelated to case; and disparate treatment where there is no difference in responses given by venirepersons. *Slappy,* 503 So.2d at 355. Once again, explanations which are merely facially race-neutral are insufficient. *Keeton,* 749 S.W.2d at 866–67, *citing Slappy,* 503 So.2d at 356.

The most exhaustive analysis of *Batson* error was found in *Ex parte Branch,* 526 So.2d 609 (Ala.1987). The Alabama Supreme Court made an illustrative list of types of evidence which can be used to raise the inference of discrimination. After the prima facie case is made, the State then has the burden of articulating a clear, specific, and legitimate reason which relates to the particular case to be tried, and which is nondiscriminatory. *Id.* Another list was given of types of evidence which can be used to overcome the presumption of discrimination and show neutrality. *Id.* A further laundry list illustrated types of evidence used to show sham or pretext. *Id.* Again, facially neutral explanations would not be enough to avoid admitting acts of group discrimination. *Keeton,* 749 S.W.2d at 867–68, *citing Ex parte Branch,* 526 So.2d 609 (Ala.1987).

The Court of Criminal Appeals next addressed the role of the appellate court. The Court adopted its own standard of review, thereby rejecting Alabama's "clearly erroneous" standard, which is also the federal standard for reviewing findings of fact. *Keeton,* 749 S.W.2d at 870; *see* FED. R.CIV.P. 52(a). Nor did the Court adopt Indiana's "abuse of discretion" standard. Instead, the Court stated that the focus of both the trial judge and the appellate court should be on whether purposeful discrimination was established. *Keeton,* 749 S.W. 2d at 870. Evidence will still be considered in the light most favorable to the trial judge's rulings in determining whether the judge's findings are supported by the record. If the record supports the trial judge, his findings will not be disturbed on appeal.

Neither party challenges whether or not a prima facie case of purposeful discrimination was established by appellant. Appellant's counsel merely stated that he was requesting the court to conduct a *Batson* hearing because there were four blacks on the jury panel and the State struck three of them, thus systematically striking blacks from the jury. The State objected to "systematically" excluded, as appellant struck the fourth black from the panel not struck by the State. The trial court then told the prosecutor that he needed to state his reasons for striking the jurors. Therefore, we have no occasion to consider whether appellant did, in fact, establish a prima facie showing of discrimination. We now turn to a review of the trial court's determination that the prosecutor did not use peremptory strikes for the purpose of excluding from jury service members of appellant's race.

In the case at bar, each side exercised ten peremptory strikes. The prosecution

struck six anglos and three blacks (the last peremptory strike is not indicated in the record). The prosecutor did not exercise strikes against all the black panel members; the fourth black venireman was struck by appellant. The State did not use a disproportionate number of strikes on black jurors. Further, the crime involved in this case was intraracial; both the victim and the defendant were black. *See Williams v. State*, 712 S.W.2d 835, 842 (Tex.App.—Corpus Christi 1986), *abated for Batson hearing*, 736 S.W.2d 906 (1987); *see also People v. Wheeler*, 22 Cal.3d 258, 583 P.2d 748, 148 Cal.Rptr. 890 (1978). There are no voir dire comments or statements by the prosecutor, also black, indicating an inference of discriminatory purpose in the striking of the three jurors. *See Rijo v. State*, 721 S.W.2d 562, 564 (Tex.App.—Amarillo 1986, no pet.). All of the jurors were questioned about their work, spouses, backgrounds, and prior experience with crime or the court system.

■ Venireman Ellis was struck because he slumped in his chair, seemed reserved when the prosecutor asked him to answer his questions which the prosecutor felt was indicative of a lifestyle that was opposite for the State, and because he felt Ellis would be biased for the defendant. During voir dire, Ellis stated that he knew the juror seated next to him because they worked at the same company. Lack of eye contact and attentiveness and no development of a back-and-forth relationship during voir dire has been upheld as a race-neutral explanation. *Townsend v. State*, 730 S.W.2d 24, 26 (Tex.App.—Texarkana 1987, no pet.). Reasons related to occupation have also been held plausible and sufficiently neutral. *Johnson v. State*, 740 S.W.2d 868, 871 (Tex.App.—Houston [14th Dist.] 1987, pet. ref'd, untimely filed). Although appellant notes that the prosecutor's explanation that Ellis' demeanor was "indicative of a lifestyle that was opposite for the State" makes no sense to appellant, demeanor and "body english" are race-neutral explanations and have also been upheld. *Chambers v. State*, 724 S.W.2d 440, 442 (Tex.App.—Houston [14th Dist.] 1987,

pet. ref'd); *see also Tompkins*, No. 68,870, slip op. at TC–87–30–125.

■ With regard to prospective juror Coleman, appellant argues there was a question as to whether Coleman was, in fact, charged with any offense at all. In final argument to the court during the *Batson* hearing, appellant's counsel stated, "As far as Ms. Coleman is concerned, she has been accused of theft, but it was all cleared up, and the case was solved." The State also noted there were police officers in the case and that her judgment might be affected since she claimed she had been wrongfully accused. We note appellant's argument that the prosecutor's statement that Ms. Coleman had a relative who had also been accused of a crime was careless disregard of what was said and that Ms. Coleman disliked the way the police handled her case was a flat misstatement, are points well-taken. Had the matter been pressed by defense counsel or brought before the trial judge during the *Batson* hearing, it might have materially affected the trial judge's ultimate finding of fact. *See Tompkins*, No. 68,870, slip op. at TC–87–30–119, n. 6A. Although Coleman did not indicate that she would be influenced by her trouble with the law, the court could have reasoned that the prosecutor struck Coleman because of an intuitive feeling that Coleman, even subconsciously, could be so influenced. *See Rijo*, 721 S.W.2d at 564. That would have been an approved exercise of the peremptory challenge. *See Allbright v. Smith*, 5 S.W.2d 970, 971 (Tex.Comm'n App.1928).

■ Janice Hall Crosby (Linton) was struck mainly due to a prior surgery; the prosecutor was concerned that she might not have the stamina to sit through the entire trial. The State also stated her educational background in trade school might give her some problems considering all the testimony. Crosby was actually an LVN, which was pointed out by appellant's counsel. The prosecutor further explained that at times when Crosby was asked to answer questions, she seemed reserved and spoke very softly; he had trouble understanding

her. Not all factors to be considered in determining whether the State's exercise of peremptory strikes is racially motivated appear in the record. Factors pertinent to credibility—voice inflections, hesitancy, facial expressions, and demeanor of both counsel and prospective jurors—may supply the basis for determining whether to infer unlawful discrimination by the State. *Yarbough v. State,* 732 S.W.2d 86, 89 (Tex. App.—Dallas 1987, pet. granted). The trial judge is accustomed to weighing such factors and is in a unique position to do so. *Id.* Even explanations such as a venireperson having a dumbfounded or bewildered look on her face or one who was gruff have been upheld in certain circumstances. *Rodgers v. State,* 725 S.W.2d 477, 481 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd), *citing Branch v. State,* 526 So.2d 605 (Ala. 1986).

Based upon the preceding analysis, we hold there was sufficient evidence in the record to support the trial judge's findings that there was no purposeful discrimination by the prosecutor in the use of his peremptory strikes. Appellant's first, second, and third points of error are overruled.

In his fourth point of error appellant alleges the trial court erred by allowing the State to attempt to impeach appellant with his postarrest silence. At trial, and out of the presence of the jury, the following testimony was given by arresting officer David Sears:

Q. And after you found him underneath the bed, what, if anything, did you do?

A. Well, we told him to come out, and he came out. And I said, "Mr. Anderson, I've got a warrant for capital murder. You're going to have to go downtown with us." And he said, "I'm not Steven Anderson."

Q. And you said that you had a warrant for him?

A. Yes, sir.

Q. And he said, "I'm not Steven Anderson"?

A. Yes, sir.

Q. And after he said that, what did you do?

A. I went ahead and searched him and handcuffed him and took him out of the apartment and placed him in a patrol car in the parking lot.

MR. WHITE: That's the testimony.

MR. BALDWIN: I wonder if the District Attorney's Office is going to go into any statements that Steven Owen Anderson might have made relative to this or any other offense?

MR. WHITE: Other than the fact that he said he wasn't Steven Anderson.

MR. BALDWIN: There are some other statements that were made to this officer. Would he be instructed not to go any further into the conversation?

THE COURT: Don't go into any further conversation.

MR. WHITE: Those statements—if he takes the stand, we may go into those as prior inconsistencies.

THE COURT: We're talking about right now.

Later, Officer Sears gave the following testimony in the presence of the jury:

A. Okay. On March 13th of '86, I went to 4830 Virgil, which is the Webber Garden Apartments.

Q. How did you have occasion to go to that address?

A. I received information from Detective Sharp that Mr. Anderson was staying with his sister in Apartment 254.

Q. Is that the apartment that you went to?

A. Yes, sir.

Q. And after you arrived, what, if anything, happened?

A. We knocked on the door and identified ourselves. We heard noises inside the apartment. However, no one would come to the door. We met a security officer down in the parking lot, and he had gone up there with us, and he called the maintenance man, who had a passkey to the apartment. And the maintenance man came up there and let us in the door.

Q. Okay. Once you went inside, what, if anything, happened?

A. We saw a black female enter—when we came in the front door, she entered into the living room with a small

child, and was pretty upset. We had our guns drawn and stuff like that. And I asked her if Steven Anderson was in the apartment, and—

Q. Did she tell you if he was in the apartment?

A. She motioned and pointed towards a back bedroom.

Q. And where did you go after that?

A. We went back—myself and another police officer went back into the back bedroom, and I looked around and didn't see anyone. And I lifted up the bedspread on some bunk beds that were there, and he was hiding under the bed.

Q. Was he underneath the bed?

A. Yes, he was.

Q. And after you found him underneath the bed, what, if anything, did you do?

A. We had him get out from under the bed, and I advised him that I had a felony warrant for his arrest and that he was going to have to come downtown with us. And he stated, "I'm not Steven Anderson."

A. [sic] He told you that he wasn't Steven Anderson?

A. Yes.

Q. That you had the wrong man?

A. Yes, sir.

MR. WHITE: Pass the witness.

MR. BALDWIN: No questions.

MR. WHITE: Just one thing more, Your Honor.

BY MR. WHITE:

Q. Is the man that you arrested in the Courtroom?

A. Yes, he is.

Q. Would you point him out, please, and describe what he is wearing for the jury?

A. The gentleman sitting over there [indicating] (brackets in original) with a dark blue sweater on and the light blue shirt.

Q. He's the one that said he wasn't Steven Anderson?

A. Yes.

MR. WHITE: Nothing further.

Subsequently at the guilt/innocence stage, appellant did take the stand and testified that the killing was done by him in self-defense. The State attempted to cross-examine appellant concerning alleged prior inconsistent statements:

Q. You also spoke with Detective Sharp on March 14th of 1985—  .

MR. BALDWIN: We're going to object, Your Honor, to any statements that he made to the officer.

At this time, we need a hearing outside the presence of the jury.

THE COURT: On what date?

MR. WHITE: March 14th of 1985.

MR. BALDWIN: The date he was arrested. Any statements that he may or may not have made under arrest— [inaudible] (brackets in original).

THE COURT: Sustained.

MR. WHITE: I'm asking him if he told Detective Sharp—

MR. BALDWIN: I'm going to object to him asking the question.

THE COURT: Overruled.

MR. WHITE: —if he told Detective Sharp that he didn't have anything to do with the shooting, self-defense or otherwise.

THE COURT: I'll sustain the objection.

MR. BALDWIN: Would you instruct the jury to disregard?

THE COURT: Please disregard the last question.

MR. WHITE: Judge, may we approach the bench?

THE COURT: No.

BY MR. WHITE:

Q. Did you ever tell anybody else?

MR. BALDWIN: I'm going to object to any statements that he might have made after he was arrested.

THE COURT: Overruled.

BY MR. WHITE:

Q. Did you ever tell anybody else that you didn't have anything to do with this shooting, self-defense or otherwise?

A. I didn't tell nobody nothing.

The record indicates there were two arresting officers, Sears and Benton. Sears testified, Benton did not. There is nothing in the record to justify the foregoing questions by the State of the appellant.

The fifth amendment guarantees an accused the right to remain silent during his trial and prevents the prosecution from commenting on the defendant's exercise of that right. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). As a general rule, when a defendant voluntarily takes the stand before the jury, he is subject to the same rules as any other witness in that he may be impeached, contradicted, and cross-examined as to new matters, and treated in every respect as any other witness testifying in his behalf, except when there are overriding constitutional or statutory prohibitions. *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). Once the defendant testifies, the interests of the other party and regard for the function of the courts to ascertain the truth becomes relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination. *Brown v. United States,* 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958). An example of federal constitutional prohibitions was set out in *Doyle.* The United States Supreme Court held that a defendant could not be impeached concerning his failure to relate exculpatory matters to officers after he had been arrested and advised of his *Miranda* warnings. *Doyle,* 426 U.S. at 618, 96 S.Ct. at 2245. *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) modified *Doyle* by allowing cross-examination by the State in absence of the sort of assurances embodied in the *Miranda* warnings. *Fletcher,* 102 S.Ct. at 1312.

The present case falls under the postarrest, pre-*Miranda* silence situation which is addressed in *Sanchez v. State,* 707 S.W.2d 575 (Tex.Crim.App.1986). There is no testimony in the record which affirmatively shows that appellant was given his *Miranda* warnings prior to the time about which he was questioned by the prosecutor.

*See Smith v. State,* 721 S.W.2d 844, 855 (Tex.Crim.App.1986). An accused's right to be free from compelled self-incrimination under the Texas Constitution arises at the moment an arrest is effectuated. *Sanchez,* 707 S.W.2d 579–80. When the State seeks to impugn the explanation of the defendant offered at trial by showing that the defendant failed to advance his position at the time of the arrest, the State is essentially impeaching the defendant through the use of prior inconsistent conduct. *Id.* at 581. It is a general rule of evidence that the prior silence of a witness as to a fact to which he has testified, where such silence occurred under such circumstances in which he would be expected to speak out, may be used to impeach the witness during cross-examination. *Franklin v. State,* 606 S.W.2d 818, 825 (Tex.Crim.App.1979). Therefore, two elements must be proven in order to use a defendant's silence as evidence of prior inconsistent conduct: 1) the person must have been expected to speak out under the circumstances; and 2) the fact that he or she did not speak out must actually be inconsistent with a later position. *Sanchez,* 707 S.W.2d at 581; *see also Williams v. State,* 607 S.W.2d 577 (Tex. Crim.App. [Panel Op.] 1980).

An arrestee is not expected to speak out while under arrest, and the fact that he does not do so should not be used against him as evidence of prior inconsistent conduct. *Sanchez,* 707 S.W.2d at 581; *Myers v. State,* 96 Tex.Crim. 546, 258 S.W. 821, 822 (1924). Moreover, merely having the opportunity to say something does not constitute a circumstance in which one would be expected to speak out. *Franklin,* 606 S.W.2d at 848. Because appellant is not required to speak out while under arrest, the fact that he does not do so cannot be used against him as evidence of prior inconsistent conduct. *Id.* Therefore, evidence of postarrest silence in the instant case fails to satisfy the first requirement of impeachment by prior inconsistent statement. *See Sanchez,* 707 S.W.2d at 581.

The second requirement, that of prior conduct being inconsistent with some later position taken at trial, is also not met.

If the Government fails to establish a threshold inconsistency between silence ... and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded.

*United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975). Postarrest silence is, at best, inherently ambiguous, and cannot be considered inconsistent with defensive matters raised at trial. *Doyle*, 96 S.Ct. at 2244–45; *Sanchez*, 707 S.W.2d at 582; *Thompson v. State*, 88 Tex.Crim.Rep. 29, 224 S.W. 892, 893 (1920). Absent a showing of actual inconsistency, postarrest silence is not probative as evidence of prior inconsistent conduct. Therefore, a defendant may not be impeached through the use of a postarrest, pre-*Miranda* silence under Texas law since such impeachment violates the defendant's right to be free from compelled self-incrimination, and also since such impeachment is improper from an evidentiary standpoint. *Sanchez*, 707 S.W.2d at 582 (declining to adopt the federal standards for postarrest, pre-*Miranda* silence as set forth in *Doyle* and *Fletcher*). Appellant's fourth point of error is sustained.

The judgment of the trial court is reversed and the case remanded for a new trial.