

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00165-CR

_____

MICHAEL EARL JOHNSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd Judicial District Court
Bowie County, Texas
Trial Court No. 11-F-0048-CR

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Michael Earl Johnson was convicted of aggravated robbery with a deadly weapon, enhancement allegations were found to be true, and Johnson was sentenced to life imprisonment. Johnson raises two points on appeal: (a) that the trial court erred in allowing a law enforcement officer to testify that Johnson was the robber, where that testimony was based on the officer's viewing of Johnson, but no other earlier contact with him and (b) that the trial court erred in overruling Johnson's *Batson*[1] challenge to one of the State's peremptory strikes in jury selection. We affirm the trial court's judgment.

**Facts of the Case**

In the early morning hours of August 17, 2009, Olivia Morgan was acting as the clerk at Stop One convenience store in Bowie County when a man entered the store and said, "Where you at?" Approaching the checkout register, Morgan encountered a bald black man in his mid- to late-thirties holding a paper towel over his mouth and nose and shaking a knife at her. Although she could not understand the words he said, his actions spoke more clearly than the words he uttered and she perceived that the store was being robbed. She promptly opened the register and handed over the cash drawer to the man, who quickly exited the store.

A security camera in the convenience store captured a video recording of good quality which showed the robber. Mike West, regional manager for the Stop One convenience stores, located a shirt discarded beside the road about a mile distant from the store which he believed

---

[1]*Batson v. Kentucky*, 476 U.S. 79 (1986).

matched that worn by the robber. West photographed the shirt where it lay, put it in a plastic shopping bag, and turned it over to Bowie County Investigator Jerl Palmore.

Palmore then retraced the route from the site where the shirt was located toward the convenience store and found thirteen brown paper towel napkins (of the type and color the video recording showed that the robber had held over his face) and the cash drawer which had been taken from the convenience store, all on the same side of the road.

After what he believed were some false starts in the investigation (including the misidentification by Morgan of the photograph of another person as the potential perpetrator of the robbery), Palmore selected a frame from the video recording and attached it to an e-mail sent to other officers, requesting that they look at the photograph to determine if they could identify the person in the picture. From that inquiry, Palmore was able to assemble photographs of nine persons (one of whom was Johnson) who resembled the photograph of the robber taken from the video recording as possible suspects. Comparing those assembled photographs with the frame from the video recording, Palmore came to the conclusion that the person in the video recording of the robbery was Johnson.

**Officer's Identification**

In his first point of error, Johnson complains that the trial court erred when the court allowed Palmore to testify that Johnson was the person seen in the store's surveillance video

recording. Johnson argues that the store clerk's identification of Johnson was suspect, or weak, and that Palmore's identification harmed Johnson.

The still photograph or frame from the video recording from the surveillance camera, which showed the top part of the robber's face, was admitted as State's Exhibit 17. The photograph of Johnson to which Palmore had compared the video recording was admitted as State's Exhibit 30. On the witness stand, Palmore was asked to compare the two photographs; Johnson's appellate complaint is based on the following section of testimony from Palmore:

> Q    [Prosecutor]   But in looking at the nose area, the ears, the eyes, the head [regarding exhibit 30, the picture of Johnson], are those the exact same appearance as they appeared in State's Exhibit 17 with him at the counter at the crime scene?

> A    [Palmore]   Yes, sir.

> [Defense Counsel]:  I'll object to this, Judge.  I don't think he's qualified to render that opinion.

> [Prosecutor]:   Judge, he can give an opinion as it --.

> THE COURT:   He can state his opinion.   That'll be overruled.

However, just a short time before this exchange occurred, the following exchange between Palmore and the State took place:

> Q    [Prosecutor]   And as you looked at that photograph [Exhibit 30] and as you looked at the individual in State's Exhibit 17 at the crime scene, from your professional experience, is that one and the same individual?

> A    Yes, sir, I believed it was.

4

Johnson lodged no objection to this testimony. To preserve a claim of error for appellate review regarding the improper admission of evidence, our law requires a party to object each time the allegedly inadmissible evidence is offered into evidence. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991); *Long v. State*, 10 S.W.3d 389, 399 (Tex. App.—Texarkana 2000, pet. ref'd). Because Palmore had already given essentially the same testimony in both exchanges, the first time being without objection from Johnson, if the trial court committed error by overruling Johnson's eventual objection, the error was not preserved for our review. Since any error was not preserved, we overrule Johnson's first point of error.

## *Batson* Challenge[2]

Next, Johnson argues that the trial court erred when it denied Johnson's claim of a violation of his rights under *Batson*.[3] Following voir dire, and before the jury was sworn, Johnson objected that the State had used a peremptory strike to eliminate an African-American venirewoman.[4]

---

[2]The State urges us to find Johnson failed to adequately preserve this point for appeal. The State directs us to *Mata v. State*, 867 S.W.2d 798 (Tex. App.—El Paso, no pet.), where our sister court upheld the trial court's ruling that the defendant failed to establish a prima facie case of racially discriminatory use of peremptory strikes. The trial court did not hold a *Batson* hearing, based on the court's finding Mata failed to make the required prima facie showing; on review, the El Paso court cited Mata's failure to provide evidence that the struck veniremembers were members of a minority group; the racial or ethnic composition of the venire; or how many of the venire were Hispanic or how many Hispanics were struck by the State. *Id.* at 805–06. We do not find *Mata* instructive, however, because in Johnson's case, the trial court proceeded to hear the State's race-neutral explanation, and effectively conduct the *Batson* hearing. Where the prosecutor has articulated his reasons for the challenged peremptory strike and the trial court has ruled on the ultimate questions of intentional discrimination, the issue of whether the defendant satisfied the requirements of making a prima facie showing becomes moot. *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009); *see Johnson v. California*, 545 U.S. 162, 168–73 (2005) (discussing requirements of prima facie showing).

[3]Racially motivated use of peremptory strikes in jury selection violates due process. *See also Keeton v. State*, 724 S.W.2d 58 (Tex. Crim. App. 1987).

5

Once a *Batson* challenge is raised, the trial court engages in a three-step inquiry. *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995); *Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999); *Montgomery v. State*, 198 S.W.3d 67, 76 (Tex. App.—Fort Worth 2006, pet. ref'd). Under the first step, the person raising a *Batson* challenge is required to make a prima facie showing of racial discrimination. *Ford*, 1 S.W.3d at 693; *Montgomery*, 198 S.W.3d at 76. Once that prima facie showing is accomplished, the burden shifts to the State to present a racially neutral reason for the challenged jury strikes. *Ford*, 1 S.W.3d at 693; *Montgomery*, 198 S.W.3d at 76. Third, and finally, once the State's reason is proffered, the burden of persuasion shifts back and the person raising the challenge must then convince the court that the reason given by the State was not race-neutral and was merely pretext for concealing discrimination. *Ford*, 1 S.W.3d at 693 (citing *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995)).

We review the evidence relevant to the *Batson* challenge in the light most favorable to the trial court's ruling. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992); *Roberts v. State*, 963 S.W.2d 894, 899 (Tex. App.—Texarkana 1998, no pet.). A high degree of deference is given to the trial court, who is in the best position to determine if the State's racially neutral explanation for a peremptory strike is genuine. *Splawn v. State*, 160 S.W.3d 103, 114 (Tex. App.—Texarkana 2005, pet. ref'd) (citing *Jasper v. State*, 61 S.W.3d 413, 421–22 (Tex. Crim. App. 2001)). Thus, a "clearly erroneous" standard of review is applied to the trial court's

---

[4]Defense counsel stated there were three African-Americans on the venire panel, but there is nothing in the record suggesting whether the other two were struck peremptorily, for cause, seated, or never reached because of their placement in the panel.

decision to overrule a *Batson* challenge.  *Hernandez v. New York*, 500 U.S. 352, 369 (1991);

*Splawn*, 160 S.W.3d at 114 (citing *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004)).

A finding is clearly erroneous where the reviewing court "is left with the definite and firm

conviction that the trial court committed a mistake."  *Roberts*, 963 S.W.2d at 899.

Once Johnson lodged his *Batson* challenge, the trial court then asked the State if it could

provide a racially neutral explanation of why it struck that particular juror.   The State responded

that he

> observed during my questioning in regard to the State's burden of proof that we did
> not have to prove this case beyond all doubt, that during the course of that
> questioning that that potential juror had her head down, refused any eye contact
> with the State at all.   The State observed her demeanor during the course of other
> questions presented and felt that -- I don't know if she was not paying attention to a
> majority of what the State and Defense presented, but she did not have -- in my
> observation of her body language, that she did not have a great deal of response to
> either side.   And the State, like I said, during that question as to beyond all doubt,
> she immediately dropped her head and would not look up at all during that
> question.

Johnson's counsel countered:

> Judge, we would show that this jury panel only had three African-Americans on the
> entire panel, and we don't think that that justification for peremptory challenge is
> sufficient to explain the peremptory challenge.   There was no questions [sic] asked
> of this lady.   There were no answers elicited from her to indicate that she may be
> biased towards the State, and there's no other reason for her challenge other than
> based on one of the members of the African-Americans being excluded.

The trial court said that it observed the venirewoman in question, and also noticed that person as

she turned her body away from the prosecutor, "looking off to the side, [and] did not appear to be

7

paying any attention." The trial court, based on this observation, found that the State had provided a racially neutral explanation for having struck the venireperson.

We grant a great deal of deference to the court's observation, as the trial court was in a much better position to observe the courtroom proceedings and occurrences than this Court (which is reduced to reading the printed word). Johnson did not controvert the State's interpretation of the venirewoman's demeanor; rather, he merely argued that no questions were asked of her. A prospective juror's demeanor and "body english" may constitute race-neutral explanations for exercising a peremptory strike. *Anderson v. State*, 758 S.W.2d 676, 680 (Tex. App.—Fort Worth 1988, pet. ref'd); *see also Yarborough v. State*, 983 S.W.2d 352, 357–58 (Tex. App.—Fort Worth 1998, no pet.) (upholding as race neutral subjective explanations about prospective juror's demeanor because such explanations were undisputed). As for the State's failure to specifically question the venirewoman at issue, a lack of questioning does not automatically undermine a proposed race-neutral explanation. *See Tate v. State*, 939 S.W.2d 738, 745 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).[5] We do not find the trial court's ruling to be clearly erroneous. Finding no clearly erroneous ruling in that regard, we overrule Johnson's second point of error.

---

[5]*See also Chambers v. State*, 866 S.W.2d 9, 24 (Tex. Crim. App. 1993) ("While it is true that the lack of questioning might expose the weakness of a State's explanation, the State is not required to ask a specified rubric of questions.").

8

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:     April 2, 2012
Date Decided:     April 3, 2012

Do Not Publish