Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

TIMOTHY EUGENE SAMPLES,
)
 No. 08-01-00261-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 Criminal District Court No. 2

)


THE STATE OF TEXAS,
)
 of Dallas County, Texas

)


 Appellee.
)
 (TC# F-0100914-UI)


O P I N I O N



 Timothy Eugene Samples appeals from his conviction for aggravated sexual assault of a child
under the age of fourteen years. A jury found Appellant guilty and assessed punishment at
imprisonment for a term of fifty years. We affirm.

FACTUAL SUMMARY


 Eight-year-old Raven Mason lived in a one-bedroom apartment with her mother, Barbara
Huitt, her nine-year-old brother Richard Mason III, and her mother's boyfriend, Appellant. 
Appellant and Huitt slept in the bedroom while Raven and her brother slept on a mattress or futon
in the living room. Since Raven's mother worked at night, Appellant was alone with the children. 
On more than one occasion, Appellant placed his mouth and tongue on Raven's breasts and "private
part," and touched her "butt" with his "private part." (1) He also touched her "private part" with his
fingers and put his "private part" in her mouth and in her "private part." Some of the sexual assaults
took place in the bedroom. Appellant would lock Richard out of the bedroom by placing a chair
beneath the doorknob. Raven recalled that her brother tried to open the door on one occasion but
the chair kept the door closed. Raven did not immediately tell her mother what had happened
because she thought she would be punished. In fact, when her mother asked her whether anything
had happened, she denied it. However, she eventually made an outcry to her mother and was taken
to a doctor.

 Richard testified that he and his sister slept on a mattress in the living room while his mother
and Appellant slept in the bedroom. One evening, Richard woke up during the night to go to the
bathroom. He saw that Raven was no longer on the mattress asleep next to him and he could not
find her anywhere. He saw that the door to the bedroom was closed. Despite several attempts, he
could not open the door. Richard could tell that a chair had been stuck under the doorknob. He went
back to bed alone and when he woke up the next morning, Raven was asleep next to him. 

 Barbara Huitt worked from 10 p.m. to 6 a.m. as a nurse's aide for a nursing facility. 
Appellant lived with Huitt and her two children while her husband, Richard Mason Jr., was serving
time in prison. One morning, Huitt came home from work and could not get in the apartment
because the door had been dead-bolted. When she could not get anyone to open the door, she went
around to the bedroom window and saw Appellant and Raven in the bed with the covers pulled up
over them. After a lengthy delay, Appellant opened the door and Huitt saw that Raven was back in
her own bed. Huitt noticed that the sheets had been removed from her bed and Appellant explained
that Raven had wet the bed. Huitt found the sheets in the washing machine. Another evening, Huitt
was at home asleep in the bedroom with Appellant. She woke up and saw Raven in the bed next to
Appellant even though Raven did not normally sleep with them. Raven's gown was pulled up above
her panties. Both Raven and Appellant were awake but Huitt did not know why. Huitt made Raven
get out of the bed. The following morning, Huitt questioned Raven whether Appellant had done
anything to her. At first, Raven denied that anything had happened but she eventually admitted that
he had touched her. Huitt called her husband, who had just gotten out of prison, and they decided
to take her to a doctor. Huitt made a doctor's appointment for the following day. While Raven was
visiting her grandmother, Huitt confronted Appellant about Raven's accusations. He demanded to
see Raven so they went to talk to her at the grandmother's home. Raven would not look at Appellant
or any of them but instead kept her face covered. Appellant returned to Huitt's apartment to retrieve
his belongings and immediately left. Raven's father then called the police. 

 The following day, Huitt took Raven to the REACH Clinic associated with Children's
Hospital in Dallas. Raven was extremely upset and crying while at the clinic. Dr. Donna Persaud
examined Raven but because she was on vacation at the time of trial, one of her colleagues, Dr. Janet
Squires, testified in her place. (2) Due to Raven's behavior on the table and fear that she would be
further traumatized by the examination, Dr. Persaud gave her Versed, a medication used for
conscious sedation, in order to complete the exam. Even with sedation, Dr. Persaud had a difficult
time performing the examination. Dr. Squires explained that outside of emergency situations
involving traumatic injury, it is extremely unusual to have to sedate a child in order to perform an
examination. During the exam, Raven was crying, grimacing, and appeared scared. She worsened
when Dr. Persaud turned down the lights in an effort to calm her. Likewise, Raven became more
upset when Dr. Persaud instructed her to open her legs. Dr. Persaud made findings which she
characterized as "concerning medical findings." These findings supported a concern of abuse but
were not definitive findings of abuse. More specifically, she observed that Raven's hymen, vagina,
and mucosal tissues were swollen and irritated, and a she had a copious, cream-colored discharge. 
It is not common to see these conditions in an eight-year-old child absent sexual abuse. These
findings indicated a vaginal infection and Dr. Persaud suspected a sexually transmitted disease. 
Dr. Persaud took swabbings to test for chlamydia, trichomonas, and gonorrhea but knew that she did
not obtain good specimen samples due to the circumstances of the exam. Consequently, she believed
the cultures would not grow anything. As Dr. Persaud expected, the cultures were negative. 
Dr. Persaud still chose to treat Raven for gonorrhea and chlamydia and she prescribed two antibiotics
appropriate for those diseases. Raven did not return to the clinic for her scheduled follow-up
appointment so Dr. Persaud was unable to obtain additional specimens for testing.

 Within a few days after the medical appointment, Raven and her mother met with Detective
Richard Rivas of the Dallas Police Department's Child Abuse Unit. They met at the Dallas Children
Advocacy Center. Rivas conducted a videotaped interview of Raven and obtained a detailed
statement from her. Appellant was subsequently charged with aggravated sexual assault. 

 As part of his defense, Appellant asserted at trial that Raven fabricated the story in order to
force him out of the apartment so that her father could return to live with the family. The jury
rejected that defense and found Appellant guilty.

FACTUAL SUFFICIENCY


 In Point of Error One, Appellant challenges the factual sufficiency of the evidence to support
his conviction. He argues that the overwhelming weight of the evidence showed that Raven falsely
accused Appellant of committing the offenses in order to have him removed from her home. 

Standard of Review


 When conducting a review of the factual sufficiency of the evidence, we consider all of the
evidence, both admissible and inadmissible, but we do not view it in the light most favorable to the
verdict. Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996); Levario v. State, 964 S.W.2d
290, 295 (Tex.App.--El Paso 1997, no pet.). We review the evidence weighed by the jury that tends
to prove the existence of the elemental fact in dispute and compare it with the evidence that tends
to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); Jones v. State, 944
S.W.2d 642, 647 (Tex.Crim.App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54
(1997). A defendant challenging the factual sufficiency of the evidence may allege that the evidence
is so weak as to be clearly wrong and manifestly unjust, or in a case where the defendant has offered
contrary evidence, he may argue that the finding of guilt is against the great weight and
preponderance of the evidence. See Johnson, 23 S.W.3d at 11. Although we are authorized to set
aside the fact finder's determination under either of these two circumstances, our review must
employ appropriate deference and should not intrude upon the fact finder's role as the sole judge of
the weight and credibility given to any evidence presented at trial. See Johnson, 23 S.W.3d at 7. We
are not free to reweigh the evidence and set aside a verdict merely because we feel that a different
result is more reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997); Clewis, 922
S.W.2d at 135.

Review of the Evidence


 Appellant argues that there are no eyewitnesses and no forensic evidence to show that
he sexually assaulted the complainant, and thus, his conviction rests solely on the credibility of an
eight-year-old child complainant. The evidence is not factually insufficient simply because the
conviction is based on Raven's testimony. A conviction for aggravated sexual assault of a child is
supportable on the uncorroborated testimony of the victim if the victim made an outcry to anyone
other than the defendant within one year after the date on which the offense is alleged to have
occurred. Tex.Code Crim.Proc.Ann. art. 38.07 (Vernon Pamph. 2003). See also Jensen v. State,
66 S.W.3d 528, 534 (Tex.App.--Houston [14th Dist.] 2002, pet. ref'd); Sandoval v. State, 52 S.W.3d
851, 854 n.1 (Tex.App.--Houston [1st Dist.] 2001, pet. ref'd). Appellant vigorously challenged
Raven's credibility at trial. During cross-examination, he established that she initially liked
Appellant but was hurt when he stopped giving her presents. Raven also admitted that she wanted
her father to move back into the apartment and she was happy that he was back with the family. 
Richard Sr. moved back into the apartment shortly after Raven accused Appellant of assaulting her. 
However, Raven's credibility was supported by other evidence. Her mother had observed Raven
asleep in the same bed as Appellant which prompted her to question Raven whether Appellant had
done anything to her. Raven's brother corroborated her testimony that Appellant had locked him out
of the bedroom one night by placing a chair under the doorknob. Appellant is correct that there is
no forensic evidence connecting him with the sexual assault and the cultures were negative for
sexually transmitted disease. On the other hand, Dr. Squires testified that it is extremely uncommon
for an eight-year-old girl to have a vaginal infection in the absence of sexual abuse. She also
explained that the negative cultures do not absolutely rule out the possibility that Raven in fact had
gonorrhea or chlamydia. The jury also heard evidence regarding Raven's physical and emotional
reaction during Dr. Persaud's examination. In summary, the jury had the opportunity to judge
Raven's credibility in light of all of the evidence. The evidence supporting the guilty verdict is not
so obviously weak or contrary to the overwhelming weight of the evidence as to be factually
insufficient. Point of Error One is overruled.

EXTRANEOUS OFFENSE


 In Points of Error Two and Three, Appellant contends that the trial court erred in admitting
extraneous offense evidence that he smoked marihuana in the presence of the complainant. He
argues that the evidence is not relevant for any purpose other than character conformity and its
probative value is substantially outweighed by prejudicial impact. The State asserts that Appellant
opened the door to admission of this extraneous offense through his cross-examination of the
complainant.

 In general, "[e]vidence of other crimes, wrongs or acts is not admissible to prove the
character of a person in order to show action in conformity therewith." Tex.R.Evid. 404(b); Smith
v. State, 898 S.W.2d 838, 842 (Tex.Crim.App. 1995). Such evidence may, however, be admissible
for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident. Tex.R.Evid. 404(b). Extraneous offense evidence is
also admissible if it tends to rebut a defensive theory or establish a logical inference not anticipated
by the rulemakers. See Santellan v. State, 939 S.W.2d 155, 168-69 (Tex.Crim.App. 1997);
Tex.R.Evid. 404(b). Additionally, it may be admissible where the defendant's questioning "opens
the door." Creekmore v. State, 860 S.W.2d 880, 892 (Tex.App.--San Antonio 1993, pet. ref'd). A
defendant opens the door to admission of extraneous offenses by painting a false picture about a
character trait. See Wheeler v. State, 67 S.W.3d 879, 885 (Tex.Crim.App. 2002); Creekmore, 860
S.W.2d at 892.

 As is the case with all evidence, the trial court is given wide latitude to admit or exclude
evidence of other crimes, wrongs, or acts. Montgomery v. State, 810 S.W.2d 372, 390
(Tex.Crim.App. 1990)(op. on reh'g). As long as the trial court's ruling is within the "zone of
reasonable disagreement," there is no abuse of discretion and the trial court's ruling will be upheld.
Id. at 391.

 During cross-examination of the complainant, Appellant elicited testimony that he had
watched over Raven while her mother was at work:

 [Defense counsel]: Did your mom often -- she worked how many days a week?


 [Complainant]: Three.


 [Defense counsel]: And when your mom was at work, whose job was it to watch and
take care of y'all?


 [Complainant]: [Appellant's].


 [Defense counsel]: And if there was a problem, who would you -- like something
bad happened, who would you go and ask to help you when your mom was at work? 
Would it be [Appellant]?


 [Complainant]: Yes.


 [Defense counsel]: And when you mom was at work, [Appellant] always kind of
watched out for you, didn't he?


 [Complainant]: Yes.


 [Defense counsel]: Did he always check on you to make sure you didn't get in
trouble?


 [Complainant]: Yes. 


 On re-direct, the State requested permission from the trial court to introduce an extraneous
offense because Appellant had portrayed himself as a good caregiver and "pseudoparent" of the
complainant. The State wished to elicit testimony from Raven that she and her brother had been in
a vehicle with Appellant when he drove to a house and obtained some "green stuff." Appellant
smoked the green stuff and it "smelled funny." Raven testified about the incident in a hearing
outside the presence of the jury. Raven said that Appellant called the green stuff "weed." During
the hearing, Raven referred to the substance as marihuana and she told the trial court that it smelled
like "pot." The trial court specifically found that the extraneous offense was admissible to rebut the
impression that Appellant was a good caregiver. Raven then testified about the incident before the
jury. She added that she was familiar with drugs because her father "used to smoke them." 

 Appellant argues that he did not open the door to admission of this evidence because he did
not offer evidence that he had been a good provider or caregiver for the children. The evidence
simply showed that he had babysat the complainant and insured that she did not get in trouble. We
disagree. As can be seen by the above exchange, Appellant left the jury with the impression that 
he "watched out for" the complainant and her brother while their mother was at work. One
implication of this evidence is that he would not act contrary to the complainant's best interest or
harm her. Evidence that Appellant had smoked marihuana in the presence of the children tends to
rebut the notion that he was a good caregiver. Therefore, it is admissible to rebut the defensive
theory and to correct the false impression.

 Appellant also argues that the extraneous offense should have been excluded under Rule 403.
Relevant evidence is generally admissible, but it is properly excluded under Rule 403 when "its
probative value is substantially outweighed by the danger of unfair prejudice." Tex.R.Evid. 403; 
Reese v. State, 33 S.W.3d 238, 239 (Tex.Crim.App. 2000). Evidence is unfairly prejudicial when
it has "an undue tendency to suggest that a decision be made on an improper basis." Reese, 33
S.W.3d at 239, quoting Montgomery, 810 S.W.2d at 389. A Rule 403 analysis by the trial court
should include, but is not limited to, the following factors:

 (1) how probative is the evidence;


 (2) the potential of the evidence to impress the jury in some irrational, but
nevertheless indelible way;


 (3) the time the proponent needs to develop the evidence; and 


 (4) the proponent's need for the evidence.


Reese, 33 S.W.3d at 240-41.

 The reviewing court should, using an abuse of discretion standard, do more than decide
whether the trial judge did in fact conduct the required balancing between probative and prejudicial
values; the trial court's determination must be reasonable in view of all relevant facts. Reese, 33
S.W.3d at 241. Relevant criteria which should be considered by the trial court include whether the
opponent of the evidence seriously contested the ultimate issue to which the evidence was relevant;
whether the State had other convincing evidence to establish the ultimate issue to which the evidence
was relevant; whether the probative value of the evidence was not, either alone or in combination
with other evidence, particularly compelling; and whether the evidence was of such a nature that a
jury instruction to disregard it for any but its proffered purpose would not likely have been
efficacious. Id. When the record reveals one or more such relevant criteria reasonably conducing
to a risk that the probative value of the tendered evidence is substantially outweighed by unfair
prejudice, then an appellate court should conclude that the trial court acted irrationally in failing to
exclude it, and thus abused its discretion. Id.

 The extraneous offense had significant probative value in that it rebutted the false impression
Appellant had left with the jury. There is no indication that the jury could not have followed a
limiting instruction regarding the extraneous offense and Appellant does not argue otherwise. The
extraneous offense testimony required only a brief amount of time to develop before the jury. 
Finally, the State had no other means to rebut the false impression. Accordingly, we find that the
trial court did not abuse its discretion in admitting the testimony. Points of Error Two and Three are
overruled. 

CLOSED CIRCUIT TESTIMONY


 In Point of Error Four, Appellant asserts that the trial court abused its discretion in permitting
the complainant to testify via closed circuit. He argues that the procedure violated his right to
confrontation under Sixth Amendment and that the evidence did not show that the witness was
unavailable within the meaning of Article 38.071 of the Code of Criminal Procedure.

 The Court of Criminal Appeals has determined that the State has a sufficiently important
interest in protecting child victims from the traumatic effects of testifying to justify the use of
closed-circuit television testimony under certain circumstances. Marx v. State, 987 S.W.2d 577, 580
(Tex.Crim.App. 1999); Gonzales v. State, 818 S.W.2d 756, 764-65 (Tex.Crim.App. 1991), citing
Maryland v. Craig, 497 U.S. 836, 855-56, 110 S.Ct. 3157, 3168-69, 111 L.Ed.2d 666 (1990). To
justify the use of closed-circuit television, the trial court must determine that: (1) use of the one-way
closed circuit procedure is necessary to protect the welfare of the particular child witness; (2) the
child witness would be traumatized, not by the courtroom generally, but by the presence of the
defendant; and (3) the child witness's level of emotional distress in the presence of the defendant
goes beyond mere nervousness, excitement, or reluctance to testify. Gonzales, 818 S.W.2d at 762. 
This finding of necessity equally satisfies the test to determine unavailability. Gonzales, 818 S.W.2d
at 764-65.

 Article 38.071 provides that:

 In making a determination of unavailability under this article, the court shall consider
relevant factors including the relationship of the defendant to the child, the character
and duration of the alleged offense, the age, maturity, and emotional stability of the
child, and the time elapsed since the alleged offense, and whether the child is more
likely than not to be unavailable to testify because:


 (1) of emotional or physical causes, including the confrontation with the defendant;
or


 (2) the child would suffer undue psychological or physical harm through his
involvement at the hearing or proceeding.


Tex.Code Crim. Proc. Ann. art. 38.071 §8(a)(Vernon Pamph. 2003).


 We review the trial court's determination for an abuse of discretion. Marx, 987 S.W.2d at
581 n.2. The complainant's mother testified in a hearing held outside the presence of the jury. 
Raven had not been afraid when she had been brought into the courtroom the week before trial. On
the day of trial, however, Raven became terrified when she started walking into the courtroom. She
began crying and repeatedly saying "no." She refused to enter the courtroom and went into what
Huitt called a "baby position." (3) Further, Raven would not let her mother touch her. Huitt testified
that her daughter refused to enter the courtroom because she was terrified of Appellant and believed
he was going to come "get her." In her opinion, it would be traumatic for Raven to testify in the
courtroom and she would be actually unable to "say a word." At the conclusion of the hearing, the
trial court specifically found that good cause existed to permit the complainant to testify via closed-circuit television. Additionally, the court found that the procedure was necessary to protect the
complainant's welfare because she had been severely traumatized in her attempt to come into the
courtroom, she would be traumatized by the presence of Appellant in the courtroom, and that the
emotional distress suffered by the complainant was not de minimis and was more than mere
nervousness, excitement, or a small reluctance to testify. 

 Appellant argues that the sexual assaults took place over a limited period of time and more
than a year had passed between the offenses and trial. While the complainant is, as Appellant points
out, a bright and energetic child, the evidence presented at the hearing supports the trial court's
determination that she would have been significantly traumatized if forced to testify in Appellant's
presence. Accordingly, the trial court did not abuse its discretion in finding her unavailable. Point
of Error Four is overruled.

CONSTITUTIONALITY OF RULE 606(B)


 In Point of Error Five, Appellant challenges the constitutionality of Tex.R.Evid. 606(b) 
which prevents jurors from impeaching their verdict by testifying about the deliberative process.
Appellant argues that this rule, as applied, violates his rights to a trial by a fair and impartial jury
under the United States and Texas Constitutions because it prohibited him from proving that the jury
had been subjected to an outside influence. See U.S.Const. amends. VI and XIV; Tex.Const. Art.
I, §15.

 Appellant filed an amended motion for new trial alleging jury misconduct. He supported the
motion with an affidavit by one of the jurors, Billie Allen, who alleged that another juror, Janice
McMurtrey, stated during deliberations that she had been sexually abused as a child and she knew
what the complainant was going through and would go through for the rest of her life. According
to Allen, the other jurors expressed sympathy for McMurtrey. McMurtrey had not disclosed this
abuse during voir dire. Appellant did not submit an affidavit or testimony by McMurtrey. (4) The trial
court determined that Allen's affidavit constituted a direct comment on matters and statements
occurring during deliberations, as well as a disclosure of the effect particular statements had on a
juror's mind, emotions, and mental processes. As such, the trial court found that Rule 606(b)
precluded consideration of the affidavit and it denied the motion for new trial. 

 Rule 606(b) provides:

 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify
as to any matter or statement occurring during the jury's deliberations, or to the effect
of anything on any juror's mind or emotions or mental processes, as influencing any
juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit
or any statement by a juror concerning any matter about which the juror would be
precluded from testifying be admitted in evidence for any of these purposes.
However, a juror may testify: (1) whether any outside influence was improperly
brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified
to serve.


Tex.R.Evid. 606(b).


 Rule 606(b) does not prohibit non-juror testimony about alleged misconduct during
deliberations. Golden Eagle Archery, Inc. v. Jackson, 24 S.W.3d 362, 369 (Tex. 2000). Likewise,
it does not prohibit juror testimony before deliberations about alleged misconduct during trial. Id.
at 375. Rule 606(b) specifically allows jurors to testify about matters which do not involve delving
into jury deliberations, such as evidence of "outside influences." Id. at 370-71. The rule does not
define "outside influence" but case law has established that outside influences must originate from
sources other than the jury itself. Id. at 370; Garza v. State, 82 S.W.3d 791, 794 (Tex.App.--Corpus
Christi 2002, no pet.). The following acts do not constitute an outside influence: (1) information
gathered by a juror and introduced to the jury; (2) coercive influence of one juror over other jurors;
and (3) injection of juror's own personal experiences or knowledge. In the Matter of S.P., 9 S.W.3d
304, 309 (Tex.App.--San Antonio 1999, no pet.); see Hines v. State, 3 S.W.3d 618, 623 (Tex.App.--Texarkana 1999, pet. ref'd). See also Franks v. State, 90 S.W.3d 771, 779-800 (Tex.App.--Fort
Worth, 2002, no pet.)(juror's affidavit stating that other jurors had coerced her into changing her vote
by telling her she was crazy and unreasonable did not show outside influence); Richardson v. State,
83 S.W.3d 332, 361-62 (Tex.App.--Corpus Christi 2002, pet. ref'd)(juror's discussion about the
application of parole law to the defendant's sentence does not constitute an outside influence). 
Although Appellant characterized the affidavit as showing that an outside influence was brought to
bear on the jury during deliberations, the affidavit shows that the information originated from
another juror. Thus, the trial court correctly concluded that the affidavit did not concern an "outside
influence," and therefore, Rule 606(b) precluded its consideration. We now consider Appellant's
constitutional challenge.

 The Court of Criminal Appeals has not directly addressed the constitutionality of Rule
606(b). However, the Court recently discussed the rule in State ex rel. Rosenthal v. Poe which
decided whether jury deliberations in a capital murder trial may be videotaped for later broadcast on
television. State ex rel. Rosenthal v. Poe, 98 S.W.3d 194, 200 (Tex.Crim.App. 2003). The Court
considered this question in the context of Article 36.22 of the Code of Criminal Procedure which
provides that: "No person shall be permitted to be with a jury while it is deliberating." Tex.Code
Crim. Proc. Ann. art. 36.22 (Vernon 1981). In concluding that Article 36.22 did not permit the
recording of jury deliberations, the Court noted that the rule requiring confidentiality of jury
deliberations is "ancient and centuries old" and its purpose is to ensure that there is "freedom of
debate," "independence of thought" and "frankness and freedom of discussion and conference." 
Poe, 98 S.W.3d at 202. The rule against a juror impeaching his own verdict, codified in Rule 606(b),
is a traditional rule designed to promote this confidentiality. Id. at 202 n.12, citing McDonald v.
Pless, 238 U.S. 264, 268, 35 S.Ct. 783, 785, 59 L.Ed. 1300 (1915). Rule 606(b) is based on a public
policy which chooses the lesser of two evils: the injury which may occur to the losing party if jury
misconduct goes undiscovered versus the injury to the public if all verdicts could be attacked by
endless inquiry into the jury's deliberative process and by harassment of individual jurors, thereby
destroying the frankness and freedom necessary to a jury's deliberation. Id.

 The Texas Supreme Court discussed these same policy considerations in Golden Eagle
Archery, Inc. v. Jackson while upholding the constitutionality of Rule 606(b). Consistent with the
Court of Criminal Appeals' discussion in Poe, the Court held that public policy demands that jury
deliberations be kept private, because: (1) jurors must be encouraged to candidly discuss the case
during deliberations; (2) jurors must be protected from post-trial harassment and tampering; (3)
disgruntled jurors must be denied an avenue for overturning the verdict; and (4) there is a need for
finality in litigation. Id. at 367. Based on these policy considerations, the Court found that Rule
606(b) does not violate federal due process or the right to a fair and impartial trial under the Texas
Constitution. Id. at 374-75.

 Intermediate appellate courts have upheld the constitutionality of Rule 606(b) against similar
challenges. See Richardson, 83 S.W.3d at 362; Hicks v. State, 15 S.W.3d 626, 630 (Tex.App.--Houston [14th Dist.] 2000, pet. ref'd); Hines v. State, 3 S.W.3d 618, 622 (Tex.App.--Texarkana
1999, pet. ref'd); Sanders v. State, 1 S.W.3d 885, 888 (Tex.App.--Austin 1999, no pet.). In Hicks,
the Fourteenth Court of Appeals expressed the same policy considerations as the Texas Supreme
Court and Court of Criminal Appeals when it observed that Rule 606(b) attempts to strike an
appropriate balance between the desire to rectify verdicts tainted by irregularities in the deliberative
process and the desire to protect jurors and promote the finality of judgments. Hicks, 15 S.W.3d at
626, citing 1 Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, Texas Practice: 
Guide to the Texas Rules of Evidence: Civil and Criminal § 606.2, at 535 (2d ed. 1993 &
Supp. 2000). The limitation on juror testimony in post-trial proceedings is intended to encourage
open discussion among jurors during deliberations, to promote the finality of judgments, and to
protect jurors from harassment by unhappy litigants seeking grounds for a new trial. Hicks, 15
S.W.3d at 626. See Tanner v. United States, 483 U.S. 107, 120-21, 107 S.Ct. 2739, 2748, 97
L.Ed.2d 90 (1987)(post-verdict scrutiny of juror conduct disrupts finality of process and undermines
full and frank discussion in jury room).

 Based on the foregoing authority, we conclude that Rule 606(b) did not operate to deny
Appellant his right to a fair trial under the United States or Texas Constitutions. It is troubling that
a juror would fail to reveal pertinent information during voir dire as allegedly occurred here, but that
issue is not before us as Appellant did not move for a new trial on that specific ground. Issue Five
is overruled.

BATSON ERROR


 In his final point of error, Appellant contends that Batson error occurred during jury selection
when the State used a peremptory challenge against Darell Washington, an African-American
venireperson. Under Batson v. Kentucky, the defendant is required to make a prima facie showing
by raising an inference of purposeful discrimination on the part of the prosecuting attorney. Batson
v. Kentucky, 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986); Brewer v. State, 932
S.W.2d 161, 164 (Tex.App.--El Paso 1996, no pet.). Once the accused establishes a prima facie case
of racially motivated strikes, the burden of production shifts to the State to provide a race-neutral
explanation. Emerson v. State, 851 S.W.2d 269, 271-72 (Tex.Crim.App. 1993); Brewer, 932 S.W.2d
at 164. In this context, a race-neutral explanation means one based on something other than the race
of the juror. Hernandez v. New York, 500 U.S. 352, 358-60, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395
(1991); Brewer, 932 S.W.2d at 164. The explanation must relate to the particular case to be tried,
but need not rise to the level justifying exercise of a challenge for cause. Batson, 476 U.S. at 97, 98,
106 S.Ct. at 1723, 1724; Brewer, 932 S.W.2d at 164. Moreover, the explanation need not be
persuasive, or even plausible. Purkett v. Elem, 514 U.S. 765, 767-68, 115 S.Ct. 1769, 1771, 131
L.Ed.2d 834 (1995); Brewer, 932 S.W.2d at 164. The issue here is the facial validity of the
prosecutor's explanation. Purkett, 514 U.S. at 768, 115 S.Ct. at 1771; Brewer, 932 S.W.2d at 164. 
Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be
deemed race-neutral. Id.

 If the prosecutor's explanation is facially valid, the burden of production shifts back to the
accused to establish by a preponderance of the evidence that the reasons given were merely a pretext
for the State's racially motivated use of its peremptory strikes. Salazar v. State, 818 S.W.2d 405,
409 (Tex.Crim.App. 1991); Brewer, 932 S.W.2d at 164. The defendant must do more than simply
state his disagreement with some of the State's explanations; he must prove affirmatively that the
State's race-neutral explanations were a sham or pretext. Brewer, 932 S.W.2d at 164; Davis v. State,
822 S.W.2d 207, 210 (Tex.App.--Dallas 1991, pet. ref'd). In examining whether the defendant
established that the prosecutor's explanation is a pretext, we consider the following non-exclusive
list of factors: 

 The reason given for the peremptory challenge is not related to the facts of the case; 

 There was a lack of questioning to the challenged juror or a lack of meaningful questions;

 Disparate treatment--persons with the same or similar characteristics as the challenged juror were 

not struck;


 Disparate examination of members of the venire, i.e., questioning a challenged juror so as to evoke
a certain response without asking the same question of other panel members; and 


 An explanation based on a group bias where the group trait is not shown to apply to the challenged
juror specifically.


Whitsey v. State, 796 S.W.2d 707, 713-14 (Tex.Crim.App. 1989).

 In reviewing the findings of the trial court on Batson issues, this Court follows the clearly
erroneous standard. Emerson v. State, 851 S.W.2d 269, 273 (Tex.Crim.App. 1993); Brewer, 932
S.W.2d at 164. We must analyze the decision of the trial court by reviewing the record in its entirety
and by considering the voir dire process, including the make-up of the venire, the prosecutor's
explanation, and the defendant's rebuttal and impeachment evidence. Whitsey v. State, 796 S.W.2d
707, 726 (Tex.Crim.App. 1990)(opinion on reh'g); Brewer, 932 S.W.2d at 164. We examine the
record in the light most favorable to the trial court's rulings. Williams v. State, 804 S.W.2d 95, 101
(Tex.Crim.App.), cert. denied, 501 U.S. 1239, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991); Brewer,
932 S.W.2d at 164. In practice, the clearly erroneous standard of review means that where there are
two permissible views of the evidence, the fact finder's choice between them cannot be clearly
erroneous. Yarborough v. State, 947 S.W.2d 892, 907-08 (Tex.Crim.App. 1997). A trial judge's
ruling which is supported by the record is never clearly erroneous. Id. Further, the appellate court
must be left with a definite and firm conviction that a mistake has been committed before it
overturns the trial judge's ruling. Id. at 908.

 After both sides exercised their peremptory challenges, Appellant challenged the prosecutor's
strikes against Jurors 7, 9, 32, 34, and 37 because the State had exercised five of its ten peremptory
challenges against African Americans. On appeal, Appellant addresses only the peremptory strike
exercised against Juror 7, Darell Washington. The prosecutor gave the following explanation for
striking Washington:

 [The prosecutor]: To begin with -- well, first of all, we would like the record to
reflect that the State did not strike Juror No. 12, who was an African-American
female, and did not strike Juror No. 16, who was also an African-American female;
and the Defense lawyer talked about a certain number of African-Americans being
on the panel, but four of them were out of the strike range of which he bases his
percentages.


 First of all, No. 7 was struck because he was wearing, first of all, a necklace. 
Typically, prosecutors, in my experience, as well as watching other prosecutors,
strike jurors that are male that are wearing jewelry. Unconventional attire,
unconventional jewelry, earrings and necklaces, suggest to the State, in its
experience, that those people are not as conservative as we would like. They do not
have the conservative goals and ideals that many people that favor the State have.


 [The Court]: Did that include Mr. Cook, who had an earring?


 [The prosecutor]: That includes Mr. Cook, who the State also struck. Jurors No. 7,
9, 10, and 30 all had jewelry, who were males; and we struck them all. Further, No.
7, Darold Washington, did not look at Felicia Wassen, the prosecutor conducting voir
dire, practically throughout her entire voir dire examination; and that caused us
concern.


 The trial court concluded that the prosecutor's explanation was race-neutral and informed
Appellant's attorney that the burden of showing purposeful discrimination by a preponderance of the
evidence had shifted to him. In response, Appellant's attorney stated as follows:

 [Defense counsel]: But I believe what I can do is object to the ruling of the trial court
and suggest that they have not stated racially neutral reasons --


 [The Court]: Sure.


 [Defense counsel]: -- and therefore place my objection on the record and rest behind
that.


 [The Court]: If that's what you wish to do.


 [Defense counsel]: I would submit that in regard to Juror 7 and Juror 9, that a
necklace will not satisfy as a racially neutral reason; and not looking at the
prosecutor, I think the Court is on pretty slippery ground in that regard. I think that
those very broad reasons to strike, like the necklace, provide the State an empower
[sic] that could be unfairly yielded. It is simply too broad to gauge.


 Appellant did not cross-examine the prosecutor and he offered no other evidence in support
of his Batson challenge. The trial court restated its prior finding that the State had provided a
reasonable race-neutral explanation for striking Juror No. 7 and further found that it had not seen any
objectionable pattern of discrimination. The court denied the Batson motion.

 Appellant argues that the prosecutor's explanations are not legitimate because in today's
society, the wearing of jewelry is not indicative of whether or not a person is conservative. Further,
he asserts, citing Oliver v. State, 826 S.W.2d 787 (Tex.App.--Beaumont 1992, pet. ref'd), that
striking an African-American juror due to inattentiveness is not a racially-neutral explanation. To
the extent Appellant suggests that the prosecutor's explanations are simply not plausible or facially
legitimate, his argument fails. In Purkett v. Elem, the United States Supreme Court reiterated that
the burden of proving purposeful discrimination rests always with the party challenging his
opponent's use of peremptory strikes. See Purkett v. Elem, 514 U.S. at 768, 115 S.Ct. at 1771. It
is error for an appellate court to combine the second step of a Batson inquiry, in which a challenged
party offers race-neutral reasons for the challenged peremptory strikes, with the third step, in which
the court determines whether the challenging party has carried his burden of proving purposeful
discrimination. Id. Therefore, we will not consider the legitimacy of the explanation in determining
whether the State carried its burden of providing a race-neutral explanation.

 It is well established that striking a juror because of his appearance or attire is a race-neutral
reason. See Purkett, 514 U.S. at 768-69 (striking juror because of his appearance including having
a mustache and beard was race-neutral explanation). Further, striking male jurors for wearing certain
items of jewelry has been held a race-neutral explanation. See Lee v. State, 949 S.W.2d 848, 851
(Tex.App.--Austin 1997, pet. ref'd)(male juror with two earrings); Bryant v. State, 923 S.W.2d 199,
209 (Tex.App.--Waco 1996), pet. ref'd by 940 S.W.2d 663 (Tex.Crim.App. 1997)(earrings). As
noted by the trial court, the State struck other non-minority jurors for the same reason. Appellant
did not present any evidence to show that the State failed to strike non-African-American jurors who
wore necklaces. Thus, there is no evidence of disparate treatment. A potential juror's demeanor
during voir dire, including a lack of eye-contact with the prosecutor or apparent disinterest, is also
a race-neutral reason for exercising a peremptory challenge. Yarborough, 947 S.W.2d at 896;
Anderson v. State, 758 S.W.2d 676, 680 (Tex.App.--Fort Worth 1988, pet. ref'd). Appellant
presented no evidence to rebut this explanation or to show that the State failed to strike other
disinterested jurors who were not African-American. Other than generally disagreeing with the
legitimacy of the prosecutor's explanations, Appellant presented no evidence showing that the State
engaged in purposeful discrimination through the exercise of its peremptory challenges. Simply
stating disagreement with the State's explanations is insufficient to meet the burden of proving
purposeful discrimination. Johnson v. State, 959 S.W.2d 284, 290 (Tex.App.--Dallas 1997, pet.
ref'd); Brewer, 932 S.W.2d at 164. Because the record supports the trial court's conclusion that
Appellant failed to prove purposeful discrimination by a preponderance of the evidence, we overrule
Point of Error Six. The judgment of the trial court is affirmed.


August 28, 2003 

 ANN CRAWFORD McCLURE, Justice

Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.


(Do Not Publish)
1. Raven demonstrated through the use of anatomically correct drawings of a girl and boy that by her "private
part," she meant the female sexual organ and by his "private part," she meant penis. 
2. Dr. Squires was familiar with Raven's case because she had gone over it during a peer review meeting with
Dr. Persaud. 
3. The jury did not see the complainant's refusal to enter the courtroom. 
4. Appellant limited his motion for new trial to the allegation that the jury received evidence from an outside
influence. He did not move for a new trial on the ground that McMurtrey had failed to disclose a bias against him.