**Anthony Desean DAVIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–90–00871–CR.**

Court of Appeals of Texas,
Dallas.

Dec. 11, 1991.

Rehearing Denied Jan. 22, 1992.

Gary A. Udashen, Dallas, for appellant.

Sharon Batjer, Dallas, for appellee.

Before ROWE, THOMAS and BURNETT, JJ.

## OPINION

BURNETT, Justice.

Anthony Desean Davis appeals his conviction for murder. After a jury trial, the trial court set punishment at thirty years' confinement in the Texas Department of Criminal Justice, Institutional Division. In five points of error, Davis asserts (1) that he received ineffective assistance of counsel and that the trial court erred when it (2) failed to limit the definition of knowingly and intentionally to the result of the conduct in the jury charge, (3) failed to charge the jury on the lesser included offense of aggravated assault, and (4) determined that the State's explanations for striking two venirepersons were racially neutral. We overrule Davis's points of error. We affirm the trial court's judgment.

## FACTS

On January 12, 1990, Dallas Police Officer Mitchell Gatson responded to a call concerning a dead body. When he arrived at the body's location, a twenty-acre pasture, he was met by a neighbor of the property's owner. The neighbor had found the body lying in the pasture behind his house at the bottom of a hill. The deceased's clothes were torn and one of his legs appeared broken. Officer Gatson observed drag marks coming down the hill and light spots of blood trailing from the hilltop.

Dallas Police Detective William Hamilton also responded to a call concerning the dead body. After identifying the deceased as Daniel Jackson, he interviewed Jackson's wife. She informed him that a neighbor had already told her about her husband's death. The detective told her that he wanted to talk to the person who told the neighbor about the homicide. As a result, Darrin Williams contacted the police the next day and gave them the names of the three people involved in the shooting—Anthony Davis, Chris, and "Man"—and told them the name of the apartment com-

plex where they could be found. The police obtained a photograph of Davis, placed it in a six-photo lineup, and showed it to Williams. Based on Williams's review of the photo lineup, the police obtained a murder warrant for Davis and a search warrant for the apartment where Davis, Chris, and Man had been staying. As a result of the search, the police recovered a handgun and some photographs.

Continuing their investigation, the police obtained Christopher Brewster's name as a possible suspect. They got Brewster's photograph, put it in a six-photo lineup, and showed it to Williams. Based on Williams's review of this lineup, the police issued an arrest warrant for Brewster. At that time, the police already had Davis in custody. Several days later the police arrested Brewster. The police never arrested Man.

The investigation continued, and the police questioned a man named Billy Kelly, Davis's cousin, when they saw him wearing a cap with the name "Man" written on it. Kelly explained that he obtained the cap after Man had inadvertently taken Kelly's cap when they were both at Davis's apartment. Kelly testified that at various times he had seen both Brewster and Man at Davis's apartment and that he had seen both of them with guns at the apartment. Kelly also testified that after Davis's arrest, Davis called him and told him that he had killed someone. Davis also told him that he had killed the individual over money.

Williams testified that on the morning of January 11, he went to Davis, Brewster, and Man's apartment to buy drugs from them. When no one answered the door, he went across the street to a second apartment complex, where he met Jackson, who took him to an apartment to purchase crack cocaine. The two men then smoked the crack in Jackson's wife's car.

At approximately 5:00 p.m., they wanted some more drugs and decided to "rent" Jackson's wife's car to Davis, Brewster, and Man in exchange for the drugs. At this time a man named Ricky joined them. They then went to the apartment, and Jackson rented Davis the car for a small quantity of crack cocaine. After completing the deal, Davis discovered that Ricky owed him some money and asked Jackson if he intended to pay Ricky's debt. Jackson said he had nothing to do with the matter. Williams and Jackson then left on foot, leaving Jackson's wife's car keys with Davis. Ricky remained at the apartment.

Approximately three or four hours later, Williams returned to the apartment to get Jackson's wife's car. When he knocked on the door, Brewster answered and grabbed him by the neck. Brewster pointed a gun at Williams and asked him where the other individual was. Williams thought Brewster was referring to Jackson. Davis, Brewster, and Man, along with Williams, got into the car and drove to Jackson's location. Brewster and Man both had guns. Jackson was forced into the car, and Davis started driving around. Brewster threatened Williams and Jackson, and both men pleaded for their lives. Davis finally pulled over in a wooded area, and all the men got out of the car. After Davis got out of the car, he also pulled out a gun. Jackson kept saying he did not want to die and suddenly broke away and ran. Williams then saw all three guns fire at Jackson, after which Williams also began running. When he heard Jackson shout, Williams looked back and saw Jackson fall on the ground. Williams managed to flee.

The medical examiner, Dr. Charles Odom, testified that Jackson had two gunshot wounds to his legs. One bullet had produced lower right leg fractures, which had torn a major artery. The other bullet entered at the back of Jackson's left knee. Dr. Odom opined that the right leg wound caused Jackson's death. He also observed abrasions and scratches on Jackson's arms and chest. In Dr. Odom's opinion these occurred around the time of Jackson's death and were caused by contact with a rough, blunt surface or by falling into or crawling over barbed wire. Dr. Odom also found cocaine in Jackson's system in an amount consistent with recreational use. Finally, Dr. Odom opined that if Jackson had received prompt medical attention, he

probably would not have died from his injuries.

### *Defense Testimony*

Brewster testified that at approximately 5:00 p.m. on January 11, Williams and Jackson came by Davis's apartment to rent them Jackson's wife's car for $30. When Williams and Jackson came to get the car about 8:30 p.m., Man arranged to rent the car. Williams, Jackson, and Man then left in the car together. They returned at 9:00 p.m. and picked up Brewster. Brewster did not have a gun, and he never saw Davis with a gun. Man drove, and Brewster became nervous when Man started asking Jackson about some missing money. Man finally stopped the car and everyone got out. As Brewster observed the other three men talking, Jackson suddenly broke away from the group and started running. Man fired his gun at Jackson. At that point, Brewster also ran away. After the shooting, he saw Williams and Man drive off. Brewster denied that he ever shot Jackson. Brewster further testified that Man's real name was Marcus Hill, and that he was shot and killed on January 14.

Rhonda Cole, Brewster's aunt, testified that at approximately 10:00 p.m. on the night of the shooting, she went to Davis's apartment. Brewster came in after she arrived and appeared "very scared" and "looked like he was about to cry." She walked with him to calm him down and it took over half an hour before Brewster would talk to her. She also testified that she never saw Brewster carry a gun.

Davis did not testify on his own behalf. Davis, however, presented testimony from Kelly and two of his friends that Williams had told them that Davis had aimed his gun up in the air while the other two men shot at Jackson's legs. In rebuttal, Williams denied that he ever told Kelly or his friends that Davis had aimed his gun in the air rather than at Jackson during the shooting.

### BATSON ERROR

■ In his third and fourth points of error, Davis relies on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to argue that the trial court erred when it allowed the State to strike venirepersons numbers 26 and 30, because the State's explanations for striking these venirepersons were not racially neutral. Under *Batson,* the defendant must establish a prima facie case that the State purposefully discriminated against members of his own race in the exercise of its peremptory challenges. *Batson,* 476 U.S. at 93–94, 106 S.Ct. at 1721–1722. To establish a prima facie case, the defendant must show that (1) he is a member of a cognizable racial group, (2) the prosecutor exercised peremptory challenges to remove prospective jurors of Davis's race, and (3) these facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude venirepersons based on race. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722; *Henry v. State,* 729 S.W.2d 732, 734 (Tex.Crim.App.1987). Once the defendant establishes a prima facie case, the burden shifts to the State to come forward with a race-neutral explanation for challenging the African–American venireperson. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. If the State presents genuine race-neutral explanations for using its peremptory challenges, the burden then shifts back to the defendant to persuade the trial court by a preponderance of the evidence of the factual truth of his purposeful discrimination allegations. *Straughter v. State,* 801 S.W.2d 607, 613 (Tex.App.—Houston [1st Dist.] 1990, no pet.). The defendant must do more than simply state his disagreement with some of the State's explanations; he must prove affirmatively that the State's race-neutral explanations were a sham or pretext. *Id.*

■ In reviewing the findings of the trial court on *Batson* issues, this Court follows the clearly erroneous standard. We analyze the decision of the trial court by reviewing the record in its entirety and consider the voir dire process including the make-up of the venire, the prosecutor's explanation, and the defendant's rebuttal and impeachment evidence. *Whitsey v. State,* 796 S.W.2d 707, 726 (Tex.Crim.App.1990) (op. on reh'g). A finding remains clearly

erroneous, even though evidence exists to support it, if a review of the entire record leaves the reviewing court with the definite and firm conviction that the trial court committed a mistake. *Id.* at 721. This Court examines the record in the light most favorable to the trial court's rulings. *Williams v. State*, 804 S.W.2d 95, 101 (Tex. Crim.App.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991). We determine whether the race-neutral reason provided by the prosecutor is supported by the record or whether the appellant has introduced sufficient evidence to establish (or rebut) that the prosecutor used his peremptory challenges in such a manner that this Court can rationally infer that he engaged in purposeful racial discrimination. *Id.* We must evaluate the trial court's findings with regard to each minority person struck, because *Batson* prohibits the use of even one purely racially motivated strike. *Whitsey*, 796 S.W.2d at 727.

■ The arrest or conviction of a venireperson's relative is a race-neutral explanation for striking that venireperson. *See Munson v. State*, 774 S.W.2d 778, 779–80 (Tex.App.—El Paso 1989, no pet.); *Perry v. State*, 770 S.W.2d 950, 952 (Tex.App.—Fort Worth 1989, no pet.); *Wilson v. State*, 769 S.W.2d 682, 683 (Tex.App.—Beaumont 1989, no pet.). A venireperson's occupation may also serve as a race-neutral explanation for striking that venireperson. *See Branch v. State*, 774 S.W.2d 781, 783 (Tex. App.—El Paso 1989, pet. ref'd); *Daniels v. State*, 768 S.W.2d 314, 317 (Tex.App.—Tyler 1988, pet. ref'd); *York v. State*, 764 S.W.2d 328, 331 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd).

■ At the conclusion of the venirepersons' individual examinations, Davis's counsel made a *Batson* motion on Davis's behalf. It was established that (1) Davis was a black male, (2) eleven black persons were on the venire, (3) two of these eleven persons were struck for cause, (4) the State peremptorily struck five of these eleven persons, (5) one of these eleven persons was not reached, and (6) three of these eleven persons served on the jury. The trial court then gave the State "an opportu-

nity to neutralize the racial implications and overtones of the strikes made by the State." [o]

The State explained its strike of venireperson number 26, Ms. Hellon Moore, as follows:

PROSECUTOR: Ms. Moore? Your Honor, Ms. Moore related to me that her father was convicted or charged with tax evasion through the IRS. The fact that he did not receive any prison time worried me. I felt that she would be more lenient toward a person because all he received was a monetary fine.

Defense counsel then requested that the trial court allow her to cross-examine the State on its explanation. The trial court ruled that she needed to wait until the State had finished giving its explanations for each of the venirepersons struck.

The State explained its strike of venireperson number 30, Ms. Georgia White, as follows:

PROSECUTOR: Ms. White was struck, even though she was a victim of a robbery, because she was a social worker. And that's the same reason that we did not object nor try to rehabilitate Juror Number 36, Mr. Whealdon, who was also in social services, as is Ms. White.

THE COURT: Is it the State's practice to strike all social workers?

PROSECUTOR: In a case where you have young defendants, yes, it is, Your Honor.

THE COURT: All right.

PROSECUTOR: I'm afraid that they would have a view toward rehabilitation other jurors might not.

At the conclusion of the State's explanations, Davis's counsel waived cross-examination, brought forth no additional evidence, and made no argument on his motion. The trial court found that the State had effectively neutralized any racial basis for striking the venirepersons.

From a review of the record in a light most favorable to the trial court's ruling, we conclude that the record supports the trial court's finding that the State gave

race-neutral explanations. Further, Davis failed to provide any evidence to rebut that the State expended its peremptory challenges in such a manner that this Court can rationally infer that it engaged in purposeful racial discrimination. Accordingly, we overrule Davis's third and fourth points of error.

## COURT'S JURY CHARGE

■ Davis failed to object to the trial court's jury charge. When the defendant fails to make an objection to the charge at trial, on appeal he must claim that the error was fundamental, and he will only obtain a reversal if the error was so egregiously harmful that the defendant did not receive a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim. App.1984). We must assess the actual degree of harm in light of the entire jury charge, the state of the evidence, including contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the entire record. *Arline v. State*, 721 S.W.2d 348, 351–52 (Tex.Crim.App.1986).

### *Knowingly and Intentionally*

■ In his first point of error, Davis asserts that the trial court erred when it failed to limit the definition of knowingly and intentionally to the conduct's result in the jury charge during the guilt-innocence phase of trial. He argues that murder is a result-oriented offense. Therefore, it was error for the trial court to give the entire definition of knowingly and intentionally, including those portions referring to the conduct's result.

We must examine the definitions in the charge in the context in which the defined term appears without limiting it to portions of the charge standing alone. *Turner v. State*, 805 S.W.2d 423, 430 (Tex.Crim.App. 1991). The trial court gave the following definitions in the jury charge:

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or de-

sire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

In applying the law to the facts, the court instructed the jury as follows:

Now, bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the defendant, Anthony Desean Davis, either acting alone or with another as a party to the offense, as that term is herein defined, on or about the 11th day of January, 1990, in the County of Dallas and State of Texas, did then and there *knowingly or intentionally cause the death* of Daniel Jackson, an individual, by shooting the said Daniel Jackson with a firearm, a deadly weapon, you will find the defendant guilty of the offense of murder, as charged in the indictment, and you will make no finding in your verdict as to punishment.

(Emphasis added.)

The charge limited the definitions of "knowingly" and "intentionally" by applying them to the factual context; that is: Did Davis *"knowingly or intentionally cause the death* of Daniel Jackson ... by shooting the said Daniel Jackson with a firearm[?]" *See Turner*, 805 S.W.2d at 431. With this limitation, the conduct of shooting the gun alone would be insufficient to convict under the charge given. *Id.* Accordingly, we overrule Davis's first point of error.

### *Lesser Included Offense*

■ In his second point of error, Davis contends that the trial court erred when it did not charge the jury on the lesser included offense of aggravated assault. He argues that he and his co-actors lacked the

mental state necessary to commit murder because they only shot Jackson in the legs.

In determining whether the trial court should have included a charge on a lesser included offense, we make a two-step analysis. *Royster v. State,* 622 S.W.2d 442, 446 (Tex.Crim.App.1981) (op. on reh'g). First, the lesser included offense must be included in the proof necessary to establish the offense charged. Second, the record must contain some evidence that if the defendant is guilty, he is guilty of only the lesser offense. *Id.*

Murder, as defined under section 19.-02(a)(1) of the Texas Penal Code, may include aggravated assault as a lesser included offense. *Cato v. State,* 534 S.W.2d 135, 137 (Tex.Crim.App.1976); *Chew v. State,* 639 S.W.2d 27, 29 (Tex.App.—Dallas 1982, no pet.); *see* TEX.PENAL CODE ANN. §§ 19.-02(a)(1) & 22.02(d) (Vernon 1989). This satisfies the first step.

We must now review the record to see if it contains some evidence that, if guilty, Davis was only guilty of the lesser offense of aggravated assault. The record shows that:

1) Davis, Brewster, and Man drove Jackson to a secluded area.

2) Davis drove while Brewster and Man held guns on Jackson and Williams.

3) On the way, Jackson and Williams's lives were threatened. They were told that they would see heaven tonight.

4) The three men ordered Jackson and Williams out of the car, and then Davis also pulled out his gun.

5) When Jackson tried to run away, all three men fired at him.

6) Jackson received two bullet wounds, one of which tore a major artery in his right leg.

7) The three men failed to seek medical attention for Jackson and left him to bleed to death.

We find no evidence to support Davis's contention that if guilty, he was only guilty of the lesser included offense of aggravated assault. *See Harrell v. State,* 659 S.W.2d 825, 827 (Tex.Crim.App.1983). Accordingly, we overrule his second point of error.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his fifth point of error, Davis contends that his counsel provided ineffective assistance when he failed (1) to object to the jury charge definition of knowingly and intentionally and (2) to request submission to the jury of the lesser included offense of aggravated assault. Our disposition of Davis's first and second points of error renders this point of error moot.

We affirm the trial court's judgment.