Affirmed and Opinion filed October 27, 2005









Affirmed
and Opinion filed October 27, 2005.

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00613-CR

____________

 

LIONEL DOUGLAS
COLEMAN,
Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 176th
District Court

Harris County, Texas

Trial Court Cause No. 944,335

 



 

O P I N I O N








Appellant Lionel Douglas Coleman appeals
his conviction for aggregate theft of over twenty-thousand dollars and under
one-hundred-thousand dollars.[1]  In three points of error, appellant contends
that (1) the evidence is factually insufficient to sustain the guilty verdict;
(2) the trial court erred in overruling appellant=s Batson challenge;
and (3) the trial court erred in overruling appellant=s objection to
improper jury argument about appellant=s bankruptcy.

Background

Complainant Alan Bergeron owns several
restaurants in Houston, including a Denny=s on Southmore
Boulevard (ASouthmore Denny=s@).   Bergeron met appellant at a management
training program shortly after he acquired the Southmore Denny=s franchise; appellant,
who had worked in Denny=s management for several years, was
Bergeron=s instructor.  In April 2000, after Bergeron completed the
training program, he hired appellant as the general manager of the Southmore
Denny=s.  Deposits began to disappear from the
Southmore Denny=s on April 18, 2001.  Bergeron acquired a second Denny=s near the
Astrodome (AAstrodome Denny=s@) in March 2001
and transferred appellant to be manager of the Astrodome restaurant in late
November 2001.  There were no missing
deposits from the Southmore Denny=s after appellant=s transfer;
however, deposits began to disappear from the Astrodome Denny=s on December 6,
2001.  The last missing deposit was dated
April 20, 2002.  The missing deposits
totaled $76,279.89.[2]









Bergeron did not learn that any deposits
were missing until April 2002, when he hired an accountant to reconcile the
franchises= books. 
Previously, Bergeron=s father had
served as Bergeron=s accountant, and Bergeron testified that
there had never been any trouble with missing deposits while his father was his
accountant.  However, due to a serious
illness, Bergeron=s father stopped serving as accountant in
the fall of 2000.  As his father=s condition grew
worse, Bergeron spent an increasing amount of time away from the restaurants,
and by the end of 2000, he had stopped visiting the franchises altogether.  Bergeron admitted that he was distracted from
the businesses for over a year and that he had relied heavily on appellant to
manage the finances while his father was ailing.  According to Bergeron, appellant was aware of
Bergeron=s family situation
and told him not to worry about the restaurants.  After his father died in January 2002,
Bergeron once again involved himself with the franchises= finances. 

At trial, there was conflicting testimony
about how much control appellant exercised over the restaurants= money and how
well Bergeron managed their financial records. Bergeron testified that Denny=s is primarily a
cash business.  Accordingly to Bergeron,
at the end of each shift, the manager on duty would count the money in the
register, fill out a deposit stub for that amount, and place the stub in a
locked safe at the restaurant.  The
manager would also fill out a deposit ticket for the amount indicated on the
stub and deposit both the ticket and the cash at the bank.  Once the cash was deposited, the manager
would receive a deposit receipt, which he or she would place in the safe with
the corresponding records.  However,
according to appellant, this system was very disorganized, and deposit stubs
and receipts were frequently missing or scattered in various places.  Appellant also testified that it was not unusual
for the person who made the deposit to retain the receipt.








While Bergeron claimed that his deposit
system was effective, he conceded that the manager who filled out the deposit
stub and ticket was not always the same person who went to the bank, and he
admitted that there was no way of knowing who actually made a particular
deposit.  Bergeron also acknowledged that
there were several different managers at both the Southmore and the Astrodome
Denny=s who could access
the cash, the safe, and the bank.[3]   Still, Bergeron  testified that appellant made about 90-95% of
the deposits at both locations, and manager Valerie Morris agreed that
appellant made most of the deposits at the Southmore Denny=s while he worked
there.  Southmore manager Erica Kindle
also testified that she only made seven or eight deposits, and that Peter
Morant, a manager at the Astrodome Denny=s, made only a
couple of deposits for the Southmore Denny=s as well.  Appellant testified that he made sixty
percent of the deposits for both franchises. 


Bergeron confronted appellant about the
missing money and fired him on May 20, 2002. 
Three days later, police searched appellant=s house and
car.  Investigator Mike Kelly testified
that officers found deposit receipts from Bergeron=s bank throughout
appellant=s house and in his car console. Officers
also found overdue bills and creditors= notices addressed
to appellant and his wife, bankruptcy documents, gambling ticket stubs and
related correspondence, and IRS forms used to report gambling winnings.[4]  Officers also found receipts for cash
purchases, including household appliances, automotive services, and mortgage
payments.  Appellant testified that he
was able to pay such large expenses in cash because he usually cashed, rather
than deposited, his paychecks. Appellant also testified that he won $15,000 in
the lottery in August 2001.








Fraud examiner James Glass testified that
he compared the deposit receipts found at appellant=s house with
deposits that had been made into Bergeron=s Denny=s accounts.  Glass also compared the deposit receipts with
deposit stubs that showed how much cash the restaurants had collected on given
dates.  Glass=s comparison
revealed that while the dates on the receipts found in appellant=s house matched
dates on which money was deposited into the Denny=s accounts, the
deposit amounts did not always correspond with the amount of money the restaurants
had earned, as reflected by the deposit stubs. Glass=s investigation
also revealed that several of appellant=s cash
transactions coincided with dates where money was missing from the Denny=s deposits.  Accordingly, Glass surmised that appellant
would collect several days= worth of earnings
and deposit them in one transaction, but that he would keep the earnings from
one day of the group.  Glass also
testified that appellant=s bankruptcy file was still active between
April 2001 and April 2002 and commented that bankruptcy often indicates that a
defendant needs cash.  Furthermore, Glass
testified that withdrawals made from an ATM at a racetrack came from appellant=s account,
although he acknowledged that someone else could have used appellant=s ATM card if he
or she knew the PIN number.  Glass also
admitted that the gambling receipts found in appellant=s house did not
necessarily mean that appellant himself had been at the track, and that the IRS
forms bearing appellant=s name did not match the gambling
receipts.  Finally, Glass testified that
he did not examine the financial records of any other Denny=s managers.

Factual Sufficiency

In a factual sufficiency review, the reviewing court must
view all the evidence in a neutral light and determine whether the jury was
rationally justified in finding guilt beyond a reasonable doubt.  Zuniga v. State, 144 S.W.3d 477, 484
(Tex. Crim. App. 2004).  Evidence is
factually insufficient if, when considered by itself, the evidence supporting
the verdict is too weak to support a finding of guilt beyond a reasonable doubt
and thus renders the conviction clearly wrong and manifestly unjust.  Id. at 85; Vasquez v. State, 67
S.W.3d 229, 236 (Tex. Crim. App. 2002). 
Alternatively, evidence is factually insufficient if the evidence
contrary to the verdict is strong enough that the beyond-a-reasonable-doubt
standard cannot be met, even if evidence supporting guilt outweighs the
evidence to the contrary.  Zuniga,
144 S.W.3d at 484.  The reviewing
court may not substitute its own judgment for that of the jury and may not
intrude upon the jury=s role as the sole judge of the weight and
credibility of witness testimony.  Vasquez, 67 S.W.3d at 236.








To obtain a conviction for aggregate
theft, the State had to prove that appellant unlawfully, pursuant to one scheme
and continuing course of conduct, appropriated by acquiring and otherwise
exercising control over property, namely cash money, owned by Alan Bergeron,
with the intent to deprive Bergeron of the property, and the total value of the
property appropriated was over twenty-thousand dollars and under
one-hundred-thousand dollars.  Tex. Pen. Code Ann. '_ 31.03, 31.09 (Vernon 2003).  We find that the evidence is factually
sufficient to support appellant=s conviction.

First, the evidence shows that thefts
occurred at both Denny=s when appellant was the manager.  Although he was not the only manager with
access to the money, appellant himself admitted that he made deposits sixty
percent of the time, and other witnesses testified that appellant made deposits
even more frequently.  Viewed in a
neutral light, this evidence indicates that appellant had ample opportunity to
tamper with the deposits.

Secondly, receipts in appellant=s possession
showed that appellant often made deposits for several consecutive days in one
trip, but that a couple days= worth of Denny=s earnings would
be missing from the lot.  Although
appellant argues that Bergeron irresponsibly managed the businesses= finances, the
fact that Bergeron did not know who made each deposit does not dilute the
incriminating effect of the receipts found in appellant=s possession.  More importantly, money stopped disappearing
from the Southmore Denny=s once appellant left that location and it
began to disappear from the Astrodome Denny=s shortly after
appellant was transferred.  When viewed
in a neutral light, this evidence suggests that appellant kept money for himself
when he made deposits while working for each store.

Third, the State presented evidence that
appellant was going through bankruptcy proceedings when some of the thefts
occurred and that he could not pay many of his bills. Glass testified that
bankruptcy often indicates that a defendant has a motive to steal money.  As the sole judge of witness credibility and
the weight to be given to witness testimony, the jury could rationally deduce
from the testimony that appellant had a compelling reason and ample opportunity
to steal.   








The State also presented evidence that
appellant gambled and paid most of his expenses in cash.  Glass acknowledged that the gambling receipts
found in appellant=s house possibly could have been left
there by someone else, and he conceded that the ATM withdrawal from the track
did not necessarily mean that appellant had withdrawn the money himself.  However, it would be reasonable to infer that
appellant visited the track and withdrew the money from his own account.  Furthermore, the IRS gambling forms bearing
appellant=s name and appellant=s own testimony
reveal that appellant did gamble, even if not on the date on the receipts.  Appellant testified that he was able to pay
his bills in cash because he usually cashed his paychecks, and because he won
$15,000 in the lottery.  However, Glass=s investigation
revealed that many of appellant=s cash
transactions coincided with times when deposits were missing from Denny=s, which suggests
that appellant funded those transactions with stolen money.

Appellant also suggests that another
manager, Erica Kindle, who was also experiencing financial hardships when
thefts from the Southmore Denny=s occurred, had
similar access to the restaurant=s money and made
many deposits.  However, Kindle testified
that she made only seven or eight deposits, and as previously mentioned, other
witnesses testified that appellant made the vast majority of deposits.  Furthermore, Kindle worked only at the
Southmore Denny=s, and thefts occurred from both the
Southmore and Astrodome locations. 

As the sole judge of witness credibility,
the jury was free to disbelieve appellant=s explanations.
Viewing all of the above evidence in a neutral light, we find that the jury was
rationally justified in finding appellant guilty beyond a reasonable doubt and
overrule appellant=s first point of error.

Batson Challenge 








In his second point of error, appellant,
who is African-American, alleges that the prosecutor violated Batson when
he struck two African-American jurors, and that the trial court erred by
denying appellant=s motion to quash the panel.[5]  Determining whether a Batson challenge
is proper involves a three-step process. 
First, the opponent of the peremptory challenge must make out a prima
facie case of racial discrimination. 
Ford v. State, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999)
(citing Purkett v. Elem, 514 U.S. 765 (1995)).  Next, the burden of production shifts to the
proponent of the strike to present a race-neutral explanation.  Id. 
The reason offered will be deemed race-neutral unless a discriminatory
intent is inherent in the prosecutor=s
explanation.  Purkett, 514 U.S. at
767.  Finally, if the proponent of the
strike offers a race-neutral explanation, the opponent must show that the
proponent=s reasons are only a sham or pretext for
discrimination. Contreras v. State, 56 S.W.3d 274, 278 (Tex. App.CHouston [14th
Dist.] 2001, no pet.); Straughter v. State, 801 S.W.2d 607, 613 (Tex.
App.CHouston [1st
Dist.] 1990, no pet.).  The ultimate
burden of persuasion always remains with the opponent of the strike, and the
trial court must decide whether the opponent has proved purposeful racial
discrimination.  Ford, 1 S.W.3d at
693; see also Camacho v. State, 864 S.W.2d 524, 529 (Tex. Crim. App.
1993); Tompkins v. State, 774 S.W.2d 195, 201 (Tex. Crim. App.
1987).  The reviewing court views the
evidence in the light most favorable to the trial court=s ruling on a Batson
challenge and may overturn a finding that the State exercised its strikes
in a race-neutral manner only if such finding is clearly erroneous.  Adanandus v. State, 866 S.W.2d 210,
224 (Tex. Crim. App. 1993); Whitsey v. State, 796 S.W.2d 707, 720-23
(Tex. Crim. App. 1989).

Appellant alleges that the prosecutor
violated Batson by striking jurors fourteen and twenty-three.  We disagree. 
During voir dire, juror fourteen informed the prosecutor that he had a Aclose cousin@ in the Carribean
who had been arrested and imprisoned for weapons charges just two weeks
earlier.  However, the juror stated that
despite his cousin=s experience, the juror did not harbor ill
feelings about the criminal justice system. 
At the Batson hearing, the prosecutor said that he had struck
juror fourteen on the basis of his cousin=s arrest and
imprisonment Afor [what] appeared to be a felony
offense.@[6]








Similarly, juror twenty-three told the
prosecutor that his son had been arrested only a couple of weeks earlier for
criminal trespass.  A background check by
the State also revealed that eight worthless checks cases were pending against
the juror=s son. 
Juror twenty-three admitted that he disliked the behavior of the police
officers who had arrested his son; nevertheless, he said that he did not harbor
animosity toward the entire police force and felt that he could be fair and
impartial.  At the Batson hearing,
the prosecutor said that he struck juror twenty-three because of his son=s arrest and the
eight pending criminal cases.

We find that the prosecutor=s reasons for
striking both jurors were race-neutral. 
It is permissible to strike a potential juror on the basis that he has
been arrested or has friends or relatives who have been arrested or convicted.  Vargas v. State, 838 S.W.2d 552, 555 (Tex.
Crim. App. 1992); Lee v. State, 860 S.W.2d 582, 585 (Tex. App.CHouston [14th
Dist.]  1993, pet. ref=d); see also
Contreras v. State, 56 S.W.3d at 279-80 (peremptory challenge was race-neutral
where stricken juror=s brother had been convicted of DWI); Davis
v. State, 822 S.W.2d 207, 211 (Tex. App.CDallas 1991, pet.
ref=d) (striking
African-American venire person because her father had been convicted or charged
with tax evasion and served no prison time was a race-neutral reason). 

We find that the trial court=s decision to
overrule appellant=s motion to quash the panel was not
clearly erroneous.  Viewing the evidence
in the light most favorable to the trial court=s ruling, we find
that defense counsel did not prove that the prosecutor=s offered reasons
were pretexts for intentional discrimination. 
At the Batson hearing, after the prosecutor presented his
race-neutral reasons, defense counsel responded: 








Judge, the only
characteristics that these folks have in common is that they are black.  I want the record to show and reflect that
those four of the ten strikes in which [sic] exercised by the State were
exercised against the black veniremen and this was even done in response or
after sentencing questions from him that they could, in fact, remain and were
able to remain fair.[7]

Simply reiterating that the stricken
jurors were African-American and reminding the court that those jurors had
claimed they could remain impartial does not prove that the State=s reasons were
merely a pretext for racial discrimination. 
Accordingly, we find that the trial court=s ruling was not
clearly erroneous, and overrule appellant=s second point of
error.

Improper Jury Argument

In his third point of error, appellant
argues that the trial court erred in overruling his objection to references in
the State=s closing argument that appellant was in
the midst of bankruptcy during the period that the thefts occurred.  According to appellant, referring to
appellant=s bankruptcy was improper because the
record contains no evidence that appellant was in bankruptcy during the time of
the thefts.  We disagree.

Proper jury argument consists of: (1)
reasonable summation of the evidence, (2) reasonable deduction from the
evidence, (3) answer to the argument of opposing counsel, and (4) plea for law
enforcement.  Jones v. State, 38
S.W.3d 793, 796 (Tex. App.CHouston [14th
Dist.] 2001, pet. ref=d) (citing Wesbrook v. State, 29
S.W.3d 103, 115 (Tex. Crim. App. 2000)). 
Even when an argument exceeds the permissible bounds of these areas, the
error will not be reversible unless, in light of the record as a whole, the
argument is extreme or manifestly improper, violative of a mandatory statute,
or injects new facts harmful to the defendant into the trial proceeding.  Wesbrook, 29 S.W.3d at 115.  The prosecutor=s efforts must
have been a willful and calculated effort to deprive the defendant of a fair
and impartial trial.  Id.








We find that the prosecutor=s comments about
appellant=s bankruptcy did not exceed the proper
bounds of jury argument.  Appellant
claims that the bankruptcy proceeding began and ended before the first theft
occurred.  However, State=s exhibits
twenty-two and twenty-seven, which were admitted without objection at trial,
show that appellant=s bankruptcy was still ongoing during the
period of the thefts.  The first theft
occurred on April, 18, 2001 and the last occurred on April 20, 2002.  Appellant filed for bankruptcy on December 1,
1997.  For the next several years,
appellant received notices from creditors and filed numerous motions to modify
until the bankruptcy proceeding was dismissed on September 13, 2001.  The proceeding was reinstated upon appellant=s motion on
October 29, 2001, and the final decree of discharge issued on December 26,
2001.  Clearly, these exhibits
demonstrate that from April 18, 2001 until December 26, 2001, appellant=s bankruptcy
coincided with the period of the thefts. 
State=s exhibits twenty-two and twenty-seven
were admitted at trial without objection, and Kelly and Glass both testified
about the documents= significance; therefore, the prosecutor=s comments
constituted reasonable summation of the evidence.  Accordingly, we overrule appellant=s final point of
error and affirm appellant=s conviction.

 

 

 

 

/s/      Adele
Hedges

Chief Justice

 

 

Judgment rendered
and Opinion filed October 27, 2005.

Panel consists of
Chief Justice Hedges and Justices Yates and Anderson.

Do Not Publish C Tex. R. App. P. 47.2(b).

 

 











[1]  A jury
assessed punishment of not less than five years in the Correction Institutional
Division of the Texas Department of Criminal Justice.





[2]  Although the
record is unclear, there is evidence that twenty-nine deposits were missing.





[3]  One of the Southmore managers,
Erica Kindle, admitted that she had been experiencing financial problems when
some of the thefts occurred, namely that she could not afford her rent or
furniture payments.  When confronted by
Bergeron, appellant suggested that perhaps Kindle had stolen the money to
alleviate her financial hardship.





[4]  The bankruptcy
documents evidenced that appellant had filed two separate actions in bankruptcy.  The first was filed December 1997 and
discharged December 26, 2001.  The second
was filed August 26, 2002. 





[5]  See Batson
v. Kentucky, 476 U.S. 79 (1986) (holding that the Equal Protection Clause
prohibits the striking of venire persons solely on the basis of their race).





[6]  The prosecutor
stated that juror fourteen=s brother, not cousin, had been arrested.





[7]  The
prosecution struck four African-American venire persons.  However, appellant  addresses 
only  two of the stricken jurors
on appeal.